UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

UNITED STATES OF AMERICA,

                    Plaintiff,

            v.

ANASTASIOS P. KOLOKOURIS,

                    Defendant.

_____

REPORT & RECOMMENDATION

12-CR-6015G

## PRELIMINARY STATEMENT

By Order of Hon. Charles J. Siragusa United States District Judge, dated February 2, 2012, all pretrial matters in the above captioned case have been referred to this Court pursuant to 28 U.S.C. §§ 636(b)(1)(A)-(B).[1]

On February 2, 2012, the grand jury returned an indictment against defendant Anastosios Kolokouris ("Kolokouris" or "Taso") charging him with two counts of violating the Clean Air Act on or about December 13, 2011.  (Docket # 9).  The first count charges him with commencing a project involving disturbance of asbestos-containing material without first providing written notice to the Environmental Protection Agency ("EPA"), in violation of 42 U.S.C. §§ 7412 and 7413(c)(1) and 18 U.S.C. § 2.  (*Id.*).  The second count charges him with causing employees to disturb asbestos-containing material without ensuring that it was properly wetted, packed and sealed and by failing to properly dispose of asbestos-containing material at

_____

[1]  The case was subsequently reassigned to Chief United States District Judge Frank P. Geraci, Jr.  (Docket # 38).

an EPA approved disposal facility, in violation of 42 U.S.C. §§ 7412 and 7413(c)(1) and 18

U.S.C. § 2.

Currently pending before this Court are motions by Kolokouris seeking disclosure

of grand jury materials, dismissal of the indictment on the grounds of grand jury irregularities,

and suppression of tangible evidence.[2]  (Docket ## 13, 18, 20, 23, 36, 42, 52, 55, 62, 68, 70, 75,

93).  Also pending is Kolokouris's motion for a hearing pursuant to *Franks v. Delaware*, 438

U.S. 154 (1978).  (*Id.*).[3]  For the reasons discussed below, I recommend that the district court

deny Kolokouris's motions to dismiss the indictment, to conduct a *Franks* hearing and to

suppress tangible evidence seized from 920 Exchange Street.


## **FACTUAL BACKGROUND**

### I.     **Whitt's Testimony**

Thomas Paul Whitt ("Whitt") testified that he worked for approximately ten years

as a Senior Safety Inspector for the Asbestos Control Bureau of the New York State Department

---

[2]  Kolokouris's motion also sought to suppress statements he allegedly made to law enforcement.  (Docket # 23 at ¶¶ 74-77).  The motion, which was made by Kolokouris's prior counsel, included boilerplate allegations and did not include an affidavit from Kolokouris raising a factual issue warranting a hearing.  (*Id.*).  During oral argument I indicated to Kolokouris's prior counsel that I would recommend denial of the motion in the absence of such an affidavit.  (Docket # 25 at 2-3).  Kolokouris's prior counsel indicated that he would not withdraw the motion, nor would he be submitting an affidavit.  (*Id.*).  An affidavit has never been submitted, Kolokouris's subsequent motions did not seek to suppress statements, and neither party, despite multiple hearings, briefings and oral arguments on the pending motions, has identified or presented any evidence regarding any alleged statements made by Kolokouris.  Accordingly, I recommend that the motion to suppress statements be denied.

[3]  Kolokouris filed omnibus motions seeking other forms of relief.  Specifically, Kolokouris also sought *Brady* material, discovery and inspection, Rule 404(b), 608 and 609 evidence, *Jencks* material, a Rule 12(b)(4) notice, disclosure of criminal records of government witnesses, notice of superseding indictment and leave to file additional motions.  (Docket # 23).  Each of the above-referenced motions was decided by the undersigned or resolved by the parties in open court on August 10, 2012.  (Docket ## 26-27).

of Labor before he retired.  (Tr. A 8-9; Tr. D 6).[4]  According to Whitt, his responsibilities

included asbestos inspections and enforcement of labor regulations, including New York State

Industrial Code Rule 56 (12 N.Y.C.R.R. pt. 56).  (Tr. A 10).  Whitt testified that he did not have

any law enforcement authority or arrest powers and did not carry a weapon.  (Tr. A 12).

On December 13, 2011, at approximately 10:57 a.m., Whitt received a phone call

from his supervisor Al Jakubowski ("Jakubowski") assigning him to conduct an asbestos-related

inspection at 920 Exchange Street in Rochester, New York.  (Tr. A 10, 41-43; Tr. B at 10;

Government's Exhibit ("G. Ex.") 200).  According to Whitt, Jakubowski informed him that the

complaint had been received from an anonymous source and instructed him to expediently

commence the investigation.  (Tr. A 45; Tr. D 100-01).  The complaint indicated that workers

were working with "mag" or "friable asbestos" and that the workers were not wearing

appropriate personal protective equipment.  (Tr. D 90, 92).  According to Whitt, Jakubowski

indicated that there was an imminent health hazard.  (*Id.*).  Whitt did not know when the

complaint had been received.  (Tr. D 100-01).  At approximately 11:38 a.m., Whitt called

Jakubowski to further discuss the anonymous tip.  (Tr. B 10-11; G. Ex. 200).

Whitt initially testified that he arrived at 920 Exchange Street at approximately

1:00 p.m.  (Tr. A 45-46).  After reviewing his telephone records for that day, however, Whitt

testified that he must have arrived at the premises at approximately 12:00 p.m.  (Tr. B 11; G. Ex.

200).  Whitt testified that 920 Exchange Street consisted of a warehouse and a parking area; the

parking area had two gated entrances, one on Exchange Street and the other on Violetta Street.

---

[4]  The transcript of the May 3, 2013 hearing shall be referred to as "Tr. A __," the transcript of the
November 14, 2013 hearing shall be referred to as "Tr. B __," the transcript of the January 13, 2014 hearing shall be
referred to as "Tr. C __," the transcript of the December 8, 2014 hearing shall be referred to as "Tr. D __," and the
transcript of the February 10, 2015 hearing shall be referred to as "Tr. E __."  (Docket ## 49, 59, 61, 82, 88).

(Tr. D 61-62; G. Ex. 15A).  Whitt did not know the identity of the owner of the property.  (Tr. D 74).

According to Whitt, he drove to the premises in an unmarked Department of Labor vehicle and pulled into a driveway located on Exchange Street.  (Tr. A 12, 46-47).  Entry into the parking lot of 920 Exchange Street was blocked by a locked gate.  (Tr. A 11, Tr. D 62 ).  Whitt testified that he exited his vehicle and briefly observed "some activities" and then drove to the other gated entrance to the property off Violetta Street, which ran perpendicular to Exchange Street and afforded a better vantage point.  (Tr. A 10-11, 47-48, 50-52; Tr. D 65; G. Ex. 15A).  He discovered that the Violetta Street gate was also locked.  (Tr. A 11; Tr. D 62).  At that point, Whitt retrieved his hard hat and camera from his vehicle and approached the gated entrance.  (Tr. A 11).  Whitt testified that he was dressed casually, and had a hard hat with a Department of Labor logo, safety glasses, safety shoes and an identification badge that he wore outside his coat.  (Tr. A 12, 22, 46, 58).

From the Violetta Street gate, Whitt observed "individuals depositing materials into a debris pile next to a dumpster" about forty yards from the gate.[5]  (Tr. A 13, 56; Tr. D 65, 85-86; G. Ex. 15A).  Whitt described the debris as "construction debris."  (Tr. D 87-88).  He testified that he was concerned that the debris contained friable insulation material known as "mag" – a hazardous form of asbestos – and that the individuals were working with it without the proper protection.  (Tr. D 87-88, 92-93).  He observed that some of the individuals were wearing half-face respirators and others were wearing dust masks; none had protective clothing.  (Tr. D 87-90).  Whitt testified that a dust mask provides inadequate protection against inhalation of friable asbestos.  (Tr. D 88).  Whitt did not observe that the workers were employing any

---

[5]  Whitt originally estimated the distance from Violetta Street to the dumpster to be approximately eighty yards.  (Tr. A 56; G. Ex. 15A).  He subsequently clarified that the distance between his vantage point and the dumpster was approximately forty yards.  (Tr. D 85-86).

asbestos containment practices.  (Tr. D 90).  Whitt determined that he needed to inform the

workers that they were being exposed to a hazard and considered whether he should also issue a

"Stop Work Order."  (Tr. D 94).  Shortly after his arrival, Whitt attempted to contact Jakubowski

to discuss his observations.  (Tr. B 10-11; G. Ex. 200).

From outside the gate, Whitt took two photographs, the second with the "zoom"

feature on his camera lens.  (Tr. A 13-15, 53; Tr. D 81; G. Exs. 1-2).  The first photograph

depicts a building and parking lot, a dumpster next to a dock, a debris pile, and at least one

individual next to the dumpster and a truck.  (Tr. A 13-14, 61; G. Ex. 1).  The second photograph

shows three individuals working near the dumpster.  (Tr. A 16; G. Ex. 2).  The man closest to the

dumpster is not wearing any mask or respirator.  (*Id.*).  The photograph also depicts a building,

the dumpster and the debris pile next to the dumpster.  (*Id.*).  The dumpster has a sign affixed to

it bearing the name "Shanks," the words "Lima, N.Y.," and two telephone numbers.  (G. Ex. 2).

Although not entirely clear, the numbers appear to be "624-2126" and "582-2120."  (*Id.*).

Whitt attempted to attract the attention of the individuals at the premises by

waving his hands over his head.  (Tr. A 17, 55-56).  According to Whitt, approximately five

individuals, some of whom had emerged from the building, ceased working and looked at him.

(Tr. A 17-18; Tr. D 74).  Once he had gotten their attention, Whitt gestured to them by placing

his hands on his chest and opening them outward away from his body; he testified that his

gesture was intended to communicate his request to enter the lot.  (Tr. A 18-19).  The worker

closest to Whitt responded by raising his shoulders and opening his hands outward and

downward from the center of his body towards his side.  (Tr. A 20-21).  None of the individuals

approached the gate or attempted to speak with Whitt.  (Tr. A 57, 62-63).

According to Whitt, shortly after the individual inside the gate gestured towards him, Whitt walked along the property in a westerly direction towards Exchange Street in search of a way into the property.  (Tr. A 63, 67-68).  Whitt testified that there was a fence immediately adjoining both the Exchange Street and Violetta Street gates, but the property was not "completely fenced in."  (Tr. A 63).  Specifically, Whitt testified that the fence along Violetta Street ended at the corner of Exchange and Violetta Streets, where two houses were located. (Tr. A 68-71; G. Ex. 15A).  Whitt also testified that he did not recall any chain-link fencing between the two houses.  (Tr. A 73).  According to Whitt, he entered the parking lot from the western boundary of the property behind and between the two residential houses.  (Tr. A. 72-73; G. Ex. 15A).  Whitt testified that he did not have to climb over any fences in order to access the property.  (Tr. A 95-96).  Whitt never requested permission from the owners to walk across their backyards.  (Tr. A 73).

After he entered the parking lot, Whitt approached the five individuals in the vicinity of the dumpster.  (Tr. A 21-23, 75-76).  He testified that he identified himself and cautioned the workers that they appeared to have been exposed to asbestos fibers.  (Tr. A 21-23, 75-76; Tr. D 95).  The individual who had gestured to Whitt identified himself and indicated that he was in charge.  (Tr. A 23, 59, 76).  Two of the other individuals also identified themselves, but the others did not.  (Tr. A 24).  According to Whitt, he learned that the individuals were day laborers who had been hired to complete a job at the property.  (Tr. A 60).

In response to Whitt's inquiry, one of the workers stated that he was working for "Taso" and provided a phone number for Taso.  (Tr. A 23, 76-77).  Whitt requested that the individual call "Taso."  (*Id.*).  The worker did so and indicated to Whitt that Taso had instructed

them to leave the site.  (Tr. A 79).  Whitt stated that he wanted to take some samples, and the worker replied, "I don't care."  (Tr. A 79, 81).

The workers entered the warehouse, and Whitt took some photographs in the lot, including a close-up photograph of the truck.  (Tr. A 79, 82-83; G. Ex. 500 at 6).  That photograph clearly depicts the number on the truck's license plate.  (G. Ex. 500 at 6).  Whitt also took another photograph of the dumpster, which clearly shows that the label bears the name "Shanks," the location "Lima, N.Y.," and the phone numbers "624-2126" and "582-2120." (G. Ex. 500 at 4).

Whitt left the premises by retracing his route through the unfenced portion of the parking lot behind the two houses and down Violetta Street towards his vehicle.  (Tr. A 80).  Whitt moved his vehicle and retrieved his sampling equipment and respirator.  (Tr. A 80-82).  Whitt noticed that the workers had opened the gate of the Violetta Street entrance and were getting into their truck, and he entered the premises on foot through the open gate as the workers exited the property.  (*Id.*).  The workers locked the gate behind them.  (Tr. A 82).

Whitt took some samples from the debris pile and additional photographs.  (Tr. A 57, 79-80; Tr. D 79).  Whitt wore a respirator and a hard hat, but not a protective suit.  (Tr. D 79-80).  Whitt testified that the building at 920 Exchange Street appeared to be abandoned. (Tr. A 59-60).

After he completed those tasks, Whitt departed the locked lot by retracing his route through the unfenced portion of the premises and the backyards of the houses.  (Tr. A 86).  Whitt remained in his vehicle for approximately one hour and then re-entered the property through the same unfenced area in order to affix notices to the dumpster and to photograph the

7

posted notices.  (Tr. A 85-87; G. Ex. 500 at 13-14).  Whitt again returned to his vehicle.  (Tr. A 87).  At no time did he enter the warehouse.  (Tr. A 89-90; Tr. D 95).

Whitt made several phone calls during his inspection.  (Tr. B 11-20).  At approximately 12:11 p.m., Whitt attempted to contact Kolokouris using a telephone number he had obtained from one of the workers.  (Tr. B 11; G. Ex. 200).  Whitt tried to reach Jakubowski and left him a message at approximately 12:17 p.m.  (Tr. B 13; G. Ex. 200).  At approximately 12:25 p.m., Whitt called Doug Houghton ("Houghton"), the individual who was identified on a sign on the warehouse as the realtor for the property.[6]  (Tr. B 13-14, 35-36, 59; G. Exs. 200, 500 at 11).  Whitt testified that he contacted Houghton to obtain more information, including the identity of the property owner.  (Tr. A 77; Tr. B 14).  In his report, Whitt indicated that he contacted the realtor in order to obtain assistance with access to the site.  (Tr. B 36-37; Tr. D 19-20).  At approximately 12:28 p.m., Whitt placed two more calls to Jakubowski, but again was unable to reach him.  (Tr. B 14; D. Ex. 200).

At approximately 12:46 p.m., after he had been at 920 Exchange Street for approximately forty-five minutes, Whitt called Special Agent Angela Rivera ("Rivera"), a law enforcement officer with the EPA.  (Tr. B 14, 37-38; G. Ex. 200).  Whitt spoke to Rivera for four minutes.  (*Id.*).  According to Whitt, he told Rivera that he had responded to an anonymous complaint about 920 Exchange Street, that he believed that workers at the site had been exposed to hazardous "mag" asbestos, and that the workers had left the site.  (Tr. B 37-38).  Rivera told Whitt that she would "look into it."  (Tr. B 38).

_____

[6]  The photographs submitted by the government include a time stamp generated from metadata in Whitt's camera.  (Tr. B 30-33).  The time stamps range between 1:01 p.m. and 2:26 p.m.  (Tr. A 90; Tr. B 30-31; G. Ex. 500).  Whitt testified that he had not adjusted the time on his camera to reflect Daylight Savings Time.  (Tr. D 82-84).  Thus, the photographs were apparently taken between approximately 12:01 p.m. and 1:26 p.m., rather than between 1:01 p.m. and 2:26 p.m.

At approximately 12:54 p.m., Whitt called Jakubowski and spoke with him for approximately eight minutes.  (Tr. B 15; G. Ex. 200).  Jakubowski called Whitt immediately after that call.[7]  (*Id.*).  According to Whitt, they discussed his observations and inspection of the site.  (*Id.*).  Jakubowski told Whitt that law enforcement officers would arrive to take possession of the site and that he should cooperate with them and should not enter the warehouse.  (Tr. B 43).  Jakubowski also told Whitt that his inspection would be complete when representatives of the New York State Department of Environmental Conservation ("DEC") arrived at the site.  (Tr. B 17, 52).  It was after this phone call that Whitt re-entered the lot to affix the notices.  (Tr. B 44).

At approximately 1:26 p.m., Whitt called Rivera and spoke with her for approximately six minutes about his observations.  (Tr. B 15-16; G. Ex. 200).  They also discussed who would be arriving at the site.  (Tr. B 39).  A few minutes later, at approximately 1:33 p.m., Whitt unsuccessfully attempted to reach Kolokouris using the phone number he had received from one of the workers.  (Tr. B 16; G. Ex. 200).  At approximately 1:45 p.m., Whitt received a phone call from Investigator Chris Didian ("Didian"), an employee of DEC's law enforcement department.  (Tr. B 16-17, 44-45; G. Ex. 200).  Didian told Whitt when the DEC representative would be arriving to take possession of the site.  (*Id.*).

At approximately 2:09 p.m., Whitt spoke to Jakubowski.  (Tr. B 18; G. Ex. 200).  Whitt subsequently received a phone call from a program manager at the Asbestos Control Bureau who was "higher up in the [Department of Labor] hierarchy" than Jakubowski.  (Tr. B 18-19, 47-50; G. Ex. 200).  According to Whitt, they discussed his inspection at 920 Exchange Street, and the program manager instructed him to cooperate with the law enforcement officers.

---

[7]  At approximately 1:01 p.m., Rivera called Jakubowski and spoke with him for approximately three minutes.  (Tr. B 40-41; Defendant's Exhibit ("D. Ex.") K).  Jakubowski then called Whitt.  (*Id.*).

(*Id.*).  Whitt had more conversations with Jakubowski, who instructed Whitt to return to the site

the following day to assist with sampling.  (*Id.*).

Whitt testified that law enforcement agents, including Rivera, subsequently

arrived at 920 Exchange Street.  (Tr. A 92-93; Tr. D 77).  When they arrived, both gates leading

to the parking lot were locked.  (Tr. B 55).  Whitt testified that he spoke with Rivera when she

arrived at 920 Exchange Street about his observations and interactions with the workers.  (Tr. B

19, 53-55).  He did not explain to Rivera how he had entered the property.  (Tr. B 20, 55).  Whitt

estimated that he left the property at approximately 6:00 or 7:00 p.m.  (Tr. A 93).

The following day, at approximately 7:57 a.m., Whitt received a phone call from

Rivera to discuss the protocol for the sampling that he would be conducting at 920 Exchange

Street.  (Tr. B 56-57; G. Ex. 200).  Whitt testified that Rivera "direct[ed] what [his] activity

would be that particular day at 920 Exchange Street."  (*Id.*).

Later that day, Whitt completed a log reflecting his work-related activities the

previous day, December 13, 2011.  (Tr. B 22-30; D. Ex. I).  The log reflects that Whitt conducted

an unrelated inspection the morning of December 13, after which he had lunch and completed

paperwork related to that inspection.  (*Id.*).  According to the log, Whitt traveled to 920

Exchange Street at approximately 1:15 p.m. and remained there until approximately 4:30 p.m.

(*Id.*).  Whitt testified that he was required to record a time for lunch on his log even if he worked

through lunch.  (Tr. B 60-61).

Whitt testified that he was generally familiar with the DOL Public Employee

Safety and Health Field Operations Manual and the Occupational Safety and Health Association

("OSHA") Field Operations Manual.  (Tr. D 6, 49; D. Exs. GG, HH).  According to Whitt, the

inspection provisions of those manuals applied to OSHA inspections.  (Tr. D 9-10).  Whitt

testified that when he conducted asbestos inspections, he operated pursuant to Code Rule 56 and

a manual published by the Asbestos Control Bureau providing guidelines for asbestos

inspections.  (Tr. D 12-13, 99-102).


II.   **Rivera's Testimony**

Rivera testified that she had been employed for the past three years as a Special

Agent with the EPA's Criminal Investigation Division.  (Tr. B 62).  Her responsibilities include

investigating criminal violations of federal environmental statutes.  (Tr. B 71-72).  Rivera

testified that she was the case agent for the investigation of 920 Exchange Street and was the

affiant who applied for the warrant to search the premises on December 14, 2011.  (Tr. B 62-63,

72).  Rivera did not begin the process of preparing the search warrant application until after she

had arrived at the site on December 13, 2011.  (Tr. D 116-17).

Rivera learned of the suspected asbestos at 920 Exchange Street during a

telephone call with Whitt on December 13, 2011 at 12:46 p.m.  (Tr. B 63-64, 68).  Whitt

informed her that he was at 920 Exchange Street, had inspected the property and had observed

individuals working in and around a dumpster that he believed contained asbestos material.

(Tr. B 64, 76).  According to Rivera, Whitt told her that the workers were not licensed and were

not wearing protective equipment.  (*Id.*).  He also told her that he had gone to the property based

upon an anonymous complaint and did not tell her how he had entered the property.  (Tr. B 64,

76-77).

After speaking with Whitt, Rivera called Jakubowski at approximately 1:01 p.m.

to inquire whether an asbestos project notification had been filed for 920 Exchange Street.

(Tr. B 67).  During the phone call, Jakubowski informed Rivera that the anonymous complainant had reported the potential presence of "mag block" asbestos at the property.  (Tr. B 77-78).

En route to the property, Rivera received a second phone call from Whitt at approximately 1:26 p.m.  (Tr. B 64).  According to Rivera, Whitt did not provide any further information during that phone call.  (Tr. B 65).  Rivera and other law enforcement personnel arrived at 920 Exchange Street at approximately 2:00 p.m.  (Tr. B 87).  Neither Rivera nor any other law enforcement personnel she observed were wearing protective garb.  (Tr. D 120-21).

Rivera parked on the Exchange Street side of the property and observed a warehouse and a fence surrounding the property with a locked gate.  (Tr. B 87-89; Tr. D 113, 115).  From that vantage point, Rivera was able to see a dumpster but not the debris pile.  (Tr. D 126).  Rivera did not go to the Violetta Street side of the property, although she was aware of its existence and the fact that it was also locked.  (Tr. B 87; Tr. D 113).  According to Rivera, she did not observe any active disturbance of asbestos while she was at the property.  (Tr. D 121).

After she arrived, Rivera spoke to Whitt further about his inspection.  (Tr. B 65, 89).  She inquired about his conversations with the workers, and Whitt provided the name and telephone number that the worker had provided for his employer.  (Tr. B 65-66).  Whitt did not describe the circumstances of his entry into the premises.  (Tr. B 66, 89).

The investigating agents located an address associated with the license plate number that Whitt had observed on the truck in which the workers had departed.  (Tr. D 129).  Later that same day, two investigators went to the address.  (Tr. D 120-21, 129).  All of the workers were present at that address and were asked to return to 920 Exchange Street to be interviewed, which they did.  (Tr. D 121, 129-30).  After they arrived, they were separated and interviewed by the agents.  (Tr. D 130).

12

Rivera testified that the agents secured the property at 920 Exchange Street throughout the night until a search warrant was obtained and executed the following day.  (Tr. D 120, 128-29).  Rivera explained that the agents remained at the site to ensure that no one entered the property and that the dumpster and material were not removed from the property.  (*Id.*).

The following morning, at approximately 7:57 a.m., Rivera called Whitt to discuss plans for the warrant execution.  (Tr. B 66, 78-79).  Rivera also asked Whitt to clarify certain aspects of his prior day's conversations with the workers.  (Tr. B 66).  After that call, Rivera spoke with Jakubowski by telephone at approximately 8:09 a.m.  (Tr. B 79-81).

Rivera testified that she entered 920 Exchange Street on December 14, 2011 in order to execute the search warrant.  (Tr. D 122).  She was wearing two Tyvek suits, a full-face respirator with HEPA filters, booties covering her shoes and gloves.  (*Id.*).  Rivera testified that the other participants in the search warrant execution were similarly outfitted.  (Tr. D 123).

In and around the dumpster, Rivera observed material with properties consistent with asbestos, although she could not conclusively identify it without testing.  (Tr. D 125, 131).  According to Rivera, asbestos-containing material typically has identifying characteristics including pipe-wrap that maintains its form and material that looks like corrugated cardboard material.  (Tr. D 127).  Upon close inspection, protruding fibers can also be observed.  (*Id.*).

## III.    Resnick's Testimony

Geoffrey Resnick ("Resnick") testified that he is a private investigator who was hired by the defense to photograph the fence surrounding 920 Exchange Street.  (Tr. C 4-5).  Resnick testified that he visited the premises on January 10, 2012 and took photographs of the fence along the Violetta Street side of the property.  (Tr. C 5-6; D. Exs. O-X).  Resnick testified

that there was a fence running along the northern boundary of the property, parallel to Violetta Street.  (Tr. C 9; D. Exs. O-W).  He also photographed the fence at the corner of the property. (Tr. C 9; D. Exs. W-X).

Resnick returned to the property on November 20, 2013 and took additional photographs.  (Tr. C 12-16; D. Exs. Y-EE).  One of the photographs was taken from inside the parking lot.  (Tr. C 12; D. Exs. Y, X).  The remainder of the photographs were taken from outside the fence, facing the property, behind the two residential houses at the corner of Exchange and Violetta Streets.  (Tr. C 13, 17-20, 29; D. Exs. Z-EE).  According to Resnick, a six-foot tall fence runs along the property parallel to Violetta Street.  (Tr. C 9, 14; D. Exs. O-Y). At the corner of the property, the fence turns and runs along the western side of the property, parallel to Exchange Street.  (Tr. C 10, 12, 14; D. Exs. X, Y).  Resnick also testified that a three-foot tall fence also runs parallel to Exchange Street.  (Tr. C 14).  According to Resnick, the three-foot fence extends farther north than the six-foot fence and extends approximately nineteen feet past the northwest corner of 920 Exchange Street.  (Tr. C 14-15, 18; D. Exs. X, Z).  Resnick also testified that another fence runs between the two residential houses at the corner of Exchange and Violetta Streets, parallel to Violetta Street.  (Tr. C 21-22; D. Ex. FF).

Resnick testified that if an individual were to walk along Violetta Street outside the six-foot fence and turn at the corner of the 920 Exchange Street property, he or she could not enter into the parking lot without climbing over the three-foot fence twice and the six-foot fence once.  (Tr. C 20-21).  While Resnick acknowledged that the fence between the two residential houses had an opening in it, he testified that the opening did not appear large enough for an individual to pass through it.  (Tr. C 24-25,29-30; D. Ex. X).  Resnick also testified that there was a gap in the six-foot fence and that the three-foot fence did not proceed along the outer edge

14

of the gap because the shorter fence turned and continued parallel to Violetta Street towards

Exchange Street.  (Tr. C 31-32; D. Ex. DD).  According to Resnick, the gap in the six-foot fence

is on the Exchange Street side of the property behind one of the residential houses.  (Tr. C 32;

D. Ex. FF).


IV.   **Coniglio Testimony**

Kolokouris also presented the testimony of John P. Coniglio, the manager-director

and owner of Occupational Safety and Environmental Associates.  (Tr. E at 9-69).  He testified

generally about his education and experience involving workplace safety.  (*Id.*).  Coniglio holds

several asbestos-related certifications that permit him to work with and supervise

asbestos-related projects.  (Tr. E 15).  According to Coniglio, he is familiar with both the DOL

Public Employee Safety and Health Operations Manual and the OSHA Field Operations Manual.

(Tr. E 23-24; D. Exs. HH, GG).  Coniglio testified that he had not encountered the Asbestos

Control Bureau Field Operations Manual in the course of his experience.  (Tr. E 23, 24-27;

D. Ex. OO).

Coniglio testified that according to his review of the Asbestos Control Bureau

Field Operations Manual and Whitt's testimony and report, the inspection conducted at 920

Exchange Street involved a small or minor project and the complaint did not indicate an

imminent hazard or danger.  (Tr. E 32-33, 52).  Coniglio later testified that in formulating that

opinion, however, he had considered only the quantity of asbestos in the area of the dumpster

and had not reviewed photographs of workers in the vicinity of the dumpster.  (Tr. E 49, 52).

Coniglio agreed that the presence of workers without personal protective equipment in a

dumpster full of asbestos would constitute a hazard and that the project would be categorized as

a large project if the quantities of asbestos in the warehouse were also considered.  (Tr. E 51-53, 56).

## V.      Search Warrant Application for 920 Exchange Street

On December 14, 2011, Rivera submitted an affidavit in support of an application for a warrant to search 920 Exchange Street.  (Docket # 36-1 at 63-80).  In her affidavit, Rivera described her experience as an EPA agent, including investigations of asbestos violations.  (*Id.* at 63-70).  Rivera's affidavit described the investigation of 920 Exchange Street.  (*Id.* at 70-75).  It stated that on December 13, 2011, the DOL had received a complaint regarding improper asbestos removal at the property and Whitt was dispatched to the scene to investigate.  (*Id.* at ¶ 28).  At approximately noon that day, Whitt "conducted an inspection" at 920 Exchange Street, during which he observed a dumpster next to a loading dock area and workers moving between the dumpster and the main building.  (*Id.*).  The affidavit states that the dumpster did not contain any required warning labels for depositing asbestos or asbestos-containing materials.  (*Id.*).

According to the affidavit, Whitt observed approximately five workers on the property, only one of whom was wearing a half-face respirator mask.  (*Id.* at ¶ 29).  The others were wearing dust masks.  (*Id.*).  Whitt observed that the dumpster was approximately two-thirds full of material that he believed, based upon his training and experience, was "suspect asbestos." (*Id.*).  Whitt took samples of the material, which were sent to a laboratory for analysis.  (*Id.*).

The affidavit reported that Whitt learned that none of the workers were licensed to handle asbestos.  (*Id.* at ¶ 30).  One of the workers reported that they had been hired by "Taso" and provided Whitt a phone number for "Taso."  (*Id.*).  That same individual made a phone call and then told Whitt that the workers had to leave and lock the gate.  (*Id.*).  At that point, the

workers stopped working, locked the property, and drove away.  (*Id.*).  Whitt was able to obtain

the license plate number of the vehicle.  (*Id.*).

   The affidavit stated Rivera arrived at the property later in the afternoon and spoke

with Whitt.  (*Id.* at ¶ 31).  She observed that the property was surrounded by a chain link fence

and was secured by a lock and chain.  (*Id.*).  Rivera observed a dumpster on the property next to

a loading dock.  (*Id.*).  Rivera stated that law enforcement agents maintained continued

surveillance of the property beginning at 2:00 p.m. on December 13, 2011 through the morning

of December 14, 2011.  (*Id.* at ¶ 40).  According to Rivera, no one entered the property.  (*Id.*).

   Rivera's affidavit stated that the investigation determined that the property was

owned by Peter Kolokouris.  (*Id.* at ¶ 32).  Peter Kolokouris was contacted by phone and advised

that he would come to the property to permit law enforcement agents to inspect the contents of

the dumpster.  (*Id.*).  Rivera stated that Peter Kolokouris never appeared at the property during

the ten-hour surveillance and did not answer his phone or return messages left by the agents.

(*Id.*).

   Rivera's affidavit reported that, using the license plate number observed by Whitt,

the agents were able to connect the vehicle the workers were driving with an address in Webster,

New York.  (*Id.* at ¶ 33).  According to Rivera, agents went to that address and located the

workers.  (*Id.*).  The workers agreed to return to 920 Exchange Street, where they were

interviewed.  (*Id.* at ¶¶ 33-34).  One of the workers ("Worker 1") told Rivera that he knew both

Peter and Taso Kolokouris because he had previously done concrete projects for them.  (*Id.* at

¶ 34).  According to Worker 1, Taso Kolokouris had called him on December 12, 2011 and

requested assistance cleaning out the warehouse.  (*Id.*).  He offered to pay the worker $10.00 per

hour.  (*Id.*).  Worker 1 asked his neighbor to help him with the project.  (*Id.*).

According to Worker 1, he and his neighbor arrived at the property at approximately 8:15 a.m. on December 13, 2011 and met with Taso Kolokouris. (*Id.* at ¶¶ 34-35). Kolokouris instructed the two workers to bag up the insulation in the dumpster and provided them with "heavy duty" garbage bags, duct tape, half-face respirators and dust masks. (*Id.* at ¶ 35). According to Worker 1, Kolokouris told them to bag only the smaller pieces of insulation and to leave the metal, wood and pieces of drywall in the dumpster. (*Id.*). Worker 1 stated that the material in the dumpster was very dusty. (*Id.*). Worker 1 reported that Kolokouris left the site to pick up the other worker's girlfriend and her son to assist because of the volume of the material to be bagged. (*Id.*). They worked from approximately 8:30 a.m. until the time Whitt arrived. (*Id.*).

Rivera's affidavit stated that Worker 1 told her that by the time Whitt arrived they had bagged approximately one-third of the debris in the dumpster and had filled approximately fifty bags. (*Id.* at ¶ 36). Kolokouris had not instructed them to use water when they were bagging up the debris. (*Id.*). Kolokouris left the property in the morning and returned around lunchtime and moved the bags of material into the warehouse. (*Id.*). After Whitt arrived, Worker 1 called Kolokouris to tell him that an asbestos inspector was there, and Kolokouris told him to leave the property and to lock the gate when he left. (*Id.*). Worker 1 told Rivera that he is not licensed to handle asbestos and had not received any asbestos training. (*Id.*).

According to Rivera's affidavit, one of the other workers ("Worker 2") confirmed many of the details provided by Worker 1 during his interview with investigating agents. (*Id.* at ¶ 37). According to Worker 2, when he arrived at the property, a man wearing glasses opened the locked gate. (*Id.*). The man instructed Worker 2 to remove and separate the asbestos from the dumpster because the garbage company would not take asbestos. (*Id.*). According to Worker

2, the man instructed him to put the asbestos material inside garbage bags and provided masks with filters and rubber gloves.  (*Id.*).  At that time, according to Worker 2, the dumpster was completely full.  (*Id.*).  The man described the asbestos material as the "white, chalky stuff" and the "cardboard with the cloth on it."  (*Id.*).  Worker 2 believed that the material was pipe wrap.  (*Id.*).  He also reported finding two white Tyvek suits in the dumpster.  (*Id.*).

Rivera's affidavit reported that Worker 2 told the agents that he asked his girlfriend and her son to assist.  (*Id.* at ¶ 38).  The man who unlocked the gate picked them up and brought them to the site.  (*Id.*).  The man provided them with a box of dust masks.  (*Id.*).  According to Worker 2, they removed approximately fifty to sixty bags of asbestos material from the dumpster.  (*Id.*).  The material inside the dumpster was dry, and no water was used during the removal process.  (*Id.*).  The man moved the bags into the warehouse.  (*Id.*).  Inside the warehouse, there was also a pile of six or seven pipes, which the man told Worker 2 he had removed himself.  (*Id.*).  The man identified himself as the son of the owner of the building and told the agents that his family had owned the building for years.  (*Id.*).  Prior to leaving, the man instructed the workers to put any additional bags that they filled into the warehouse and to lock the gate when they left.  (*Id.*).

Rivera's affidavit also stated that on December 14, 2011, law enforcement agents contacted Shanks Enterprises, the company that supplied the dumpster located at 920 Exchange Street.  (*Id.* at ¶ 39).  The company representative stated that both Peter and Taso Kolokouris had communicated with it the previous week and had admitted that the dumpster contained asbestos.  (*Id.*).  Both were advised that Shanks was not licensed to handle or dispose of asbestos and could not move the dumpster until the asbestos was removed.  (*Id.*).

19

## VI.     Kolokouris's Affidavit

In support of his suppression motion, Kolokouris submitted an affidavit affirming that he is a shareholder and Vice President of John K and Associates, Inc., the company that owns the commercial building located at 920 Exchange Street.  (Docket # 20 at ¶¶ 1-2).  Kolokouris stated that the property was fenced and locked in order to exclude the public.  (*Id.*).  Kolokouris also stated that he did not give permission to anyone to enter the premises.  (*Id.*).

## REPORT & RECOMMENDATION

## I.     Entry into 920 Exchange Street

Kolokouris seeks suppression of the tangible evidence seized from 920 Exchange Street on December 13 and 14, 2011, and any fruits from such seizures on the grounds that Whitt unlawfully entered the premises without a warrant.  (Docket ## 36 at ¶ 4; 52 at ¶ 4; 62; 93).  The government maintains that Whitt's entry was lawful on five independent bases:[8]  that Whitt was provided consent to enter the property (Docket ## 40 at 10-12; 65 at 20-22); that exigent circumstances justified his entry (Docket ## 74 at 7-11; 92 at 8-17); that the evidence was lawfully seized under the plain view doctrine (Docket ## 74 at 11-13; 92 at 17-20); that the evidence was lawfully seized under the open fields doctrine (Docket ## 74 at 14-18; 92 at 20-27); and, that Whitt lawfully entered the property in order to conduct an inspection pursuant to New York State Industrial Code Rule 56 ("Code Rule 56") (Docket ## 14 at 15-16; 24 at 3-5; 40 at 4-10; 65 at 7-13; 92 at 30-34).  These purported justifications are discussed below.

---

[8]  The government also opposed the motion on the grounds that Kolokouris lacks standing to challenge the entry onto the property.  (Docket # 74 at 1-7).  This Court previously denied that challenge.  (Docket # 91 at 12-13).

A.    <u>**Consent**</u>

Although the Fourth Amendment generally requires that the government obtain a warrant before conducting a search of a person or private property, *Maryland v. Dyson*, 527 U.S. 465, 466 (1999) (*per curiam*) (citing *California v. Carney*, 471 U.S. 386, 390-91 (1985)), a warrantless search is permissible if based upon voluntary consent.  *Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973); *United States v. Elliott*, 50 F.3d 180, 185 (2d Cir. 1995), *cert. denied*, 516 U.S. 1050 (1996).  The consent need only be voluntary, that is, obtained without coercion, even if it was given without knowledge of the right to refuse consent.  *See Schneckloth v. Bustamonte*, 412 U.S. at 241-42; *United States v. Garcia*, 56 F.3d 418, 422 (2d Cir. 1995).  Consent "need not be expressed in a particular form, but 'can be found from an individual's words, acts or conduct,'" *United States v. Deutsch*, 987 F.2d 878, 883 (2d Cir. 1993) (*quoting Krause v. Penny*, 837 F.2d 595, 597 (2d Cir. 1988)), although it "must be a product of that individual's free and unconstrained choice, rather than a mere acquiescence in a show of authority." *United States v. Wilson*, 11 F.3d 346, 351 (2d Cir. 1993) (citations omitted), *cert. denied*, 511 U.S. 1130 (1994).

The government bears the burden of establishing by a preponderance of the evidence that the consent was voluntary.  *United States v. Isiofia*, 370 F.3d 226, 230 (2d Cir. 2004); *United States v. Buettner-Janusch*, 646 F.2d 759, 764 (2d Cir.), *cert. denied*, 454 U.S. 830 (1981).  "The ultimate question presented is whether the officer had a reasonable basis for believing that there had been consent to the search." *United States v. Isiofia*, 370 F.3d at 231 (internal quotations and citations omitted).  In determining the question of consent, the Second Circuit has cautioned that "consent to a search is not to be lightly inferred." *United States v. Como*, 340 F.2d 891, 893 (2d Cir. 1965).

In this case, the government urges the Court to construe the gesture made by one of the workers as implied consent to enter the property.  Specifically, the government argues that Worker 1 communicated consent to Whitt's entry into the property through his responsive gesture to Whitt's gesture.  As the record demonstrates, Whitt first waved his hands over his head to attract the workers' attention.  When they looked his way, he gestured to them by moving his hands from the middle of his chest outward from his body.  Even if this gesture reasonably could be interpreted as a commonly-understood non-verbal request to enter or be invited into a premises – a proposition hardly free from doubt – I find that Worker 1's non-verbal response could not reasonably be interpreted as consent to the request.  The worker's gesture of shrugging his shoulders and moving his hands outward from his body (which Whitt demonstrated on the witness stand) is a commonly-accepted non-verbal form of communicating that the individual does not know or care.  It is reasonable to assume that if the gesture were intended to communicate affirmative consent to enter, the worker would have taken steps to unlock the gate that prevented Whitt from entering.  In other words, on this record, it strains credulity to find that a reasonable inspector in Whitt's position reasonably would have believed he had been given consent to enter the property.  *See United States v. McAuley*, 2014 WL 7796696, *21 (W.D.N.Y. 2014) (collecting cases addressing consent communicated through non-verbal conduct), *report and recommendation adopted*, 2015 WL 540738 (W.D.N.Y. 2015).

In any event, even if the worker's gesture could be construed as conveying implied consent to enter the property, the record does not demonstrate that he or any of the workers had actual or apparent authority to consent to Whitt's entry.  *See Illinois v. Rodriguez*, 497 U.S. 177, 188-89 (1990) ("determination of consent to enter must be judged against an objective standard: would the facts available to the officer at the moment warrant a man of

reasonable caution in the belief that the consenting party had authority over the premises[;] [i]f not, then warrantless entry without further inquiry is unlawful unless authority actually exists") (internal quotation and citation omitted); *Garcia v. Dykstra*, 260 F. App'x 887, 900-01 (6th Cir. 2008) (facts of which officer was aware obligated the officer to "engage in further inquiry concerning [individual's] apparent authority to consent to a search"); *United States v. Nicoletti*, 870 F. Supp. 96, 99 (E.D. Pa. 1994) ("facts available to the officer at the moment of the search would not warrant a person of reasonable caution in the belief that [the worker] had authority over the premises such that he could consent to a search" where he informed the agents that he had been hired for the limited purpose of removing pipe and loading it onto his truck).

### B.   Exigent Circumstances

The government's argument that Whitt was entitled to enter the property to protect the workers and the public from exposure to harmful asbestos fibers implicates the emergency aid doctrine, a subset of the exigent circumstances doctrine. *See Brigham City v. Stuart*, 547 U.S. 398, 403-04 (2006); *Sutterfield v. City of Milwaukee*, 751 F.3d 542 (7th Cir.), *cert. denied*, 135 S. Ct. 478 (2014). The emergency aid exception to the warrant requirement permits "law enforcement officers '[to] enter [private property] without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury.'" *See Michigan v. Fisher*, 558 U.S. 45, 47 (2009) (quoting *Brigham City v. Stuart*, 547 U.S. at 403); *see also Montanez v. Sharoh*, 444 F. App'x 484, 486 (2d Cir. 2011) ("[p]olice officers may enter a dwelling without a warrant to render emergency aid and assistance to a person whom they reasonably believe to be in distress and in need of that assistance") (quoting *Tierney v. Davidson*, 133 F.3d 189, 196 (2d Cir. 1998)).

As the Seventh Circuit recently explained:

> [The] emergency aid doctrine . . . recognizes that a warrantless
> entry into [private property] may be appropriate when police enter
> for an urgent purpose other than to arrest a suspect or to look for
> evidence of a crime. . . . [T]his doctrine recognizes that police play
> a service and protective role in addition to a law enforcement
> role. . . . [P]olice officers may sometimes need to enter a dwelling
> in order to render aid to an occupant whom they believe to be in
> distress and in immediate need of their assistance.

*Sutterfield v. City of Milwaukee*, 751 F.3d at 557-58 (citations omitted).  The test to determine

the applicability of the emergency aid doctrine is an objective one, *see Michigan v. Fisher*, 558

U.S. at 47; *Brigham City*, 547 U.S. at 404, and inquires "whether the police, given the facts

confronting them, reasonably believed that it was necessary to enter [private property] in order to

render assistance or prevent harm to persons or property within."  *Sutterfield*, 751 F.3d at 558

(internal quotation omitted).  In this case, the government's argument assumes that Whitt, similar

to a police officer, is entrusted with public health and safety responsibilities. [9]

The defining characteristic of the emergency aid doctrine, just like the exigent

circumstances doctrine, is a "time-urgent need to act."  *Sutterfield*, 751 F.3d at 559-60; *accord*

*Anthony v. City of New York*, 339 F.3d 129, 135 (2d Cir. 2003); *United States v. Paige*, 493

F. Supp. 2d 641, 647 (W.D.N.Y. 2007); *see also Koch v. Town of Brattleboro*, 287 F.3d 162, 169

(2d Cir. 2002) ("probable cause for a forced entry in response to exigent circumstances requires

finding a probability that a person is in danger") (internal quotations omitted); *United States v.*

*Infante*, 701 F.3d 386, 392-93 (1st Cir. 2012) ("the burden is on the government to show a

reasonable basis, approximating probable cause, both for the government official's belief in the

---

[9]  Without citing any authority, the government alternatively appears to suggest that Whitt's position as a non-law enforcement agent renders his warrantless entry lawful.  (Docket # 74 at 9 & n.3, 12).  The warrant requirement applies to both law enforcement and administrative entries.  *See Spinelli v. City of New York*, 579 F.3d 160, 167 (2d Cir. 2009) ("[o]ur prior cases have established that the Fourth Amendment's prohibition against unreasonable searches applies to administrative inspections of private commercial property").

existence of an emergency and for associating the perceived emergency with the area or place to be searched"), *cert. denied*, 133 S. Ct. 2841 (2013).

Thus, the critical considerations are whether the government official reasonably believed that entry into private property was necessary to render assistance or prevent harm to someone on the property and whether he or she acted in an "expeditious, if not immediate" manner consistent with the professed urgency. *Sutterfield*, 751 F.3d at 563; *see also United States v. Kenfield*, 270 F. App'x 695, 696 (9th Cir.) (emergency aid doctrine also requires consideration of the reasonableness of the search's scope and manner to meet the emergency need), *cert. denied*, 555 U.S. 868 (2008); *United States v. Bute*, 43 F.3d 531, 539 (10th Cir. 1994) ("[t]o invoke this so-called 'emergency doctrine,' . . . the person making entry must have had an objectively reasonable belief that an emergency existed that required immediate entry to render or prevent harm to persons or property within") (internal quotations omitted). Of course, as in all Fourth Amendment inquiries, the touchstone is reasonableness. *Fisher*, 558 U.S. at 47. "The reasonableness of an officer's belief must be assessed in light of the particular circumstances confronting the officer at the time." *Kerman v. City of New York*, 261 F.3d 229, 235 (2d Cir. 2001) (citing *Graham v. Connor*, 490 U.S. 386, 397 (1989)). In assessing the totality of the circumstances, all facts within the knowledge of the government official should be taken into account. *United States v. Davis*, 290 F.3d 1239, 1243 (10th Cir. 2002).

In this case, the record does not establish an objectively reasonable basis upon which to conclude that Whitt's warrantless entry into 920 Exchange Street was justified by a need to render emergency aid or assistance to the workers at the site. As an initial matter, although Whitt was responding to a complaint about suspected asbestos at the property, the source of the complaint was anonymous and, in the absence of corroboration, an anonymous tip

is generally insufficient to justify a warrantless entry into private property.  *See Kerman v. City of New York*, 261 F.3d at 236; *United States v. Nicoletti*, 870 F. Supp. at 100 ("[t]he parties have cited no case, and we have found none, where a citizen complaint alone, regardless of its nature, is sufficient to allow a warrantless administrative search").

The government maintains that Whitt's observations upon his arrival at 920 Exchange Street, considered along with the anonymous complaint, established an objectively reasonable basis upon which to enter the property.  I disagree.  When he arrived, Whitt observed a dumpster and workers in the vicinity of the dumpster wearing half-face respirators and dust masks.  Additionally, Whitt noticed that the workers were not following required protocol for working with friable asbestos by wetting the material.

The government contends that Whitt's testimony demonstrates that he observed "workers plainly and openly exposed to asbestos from outside the Violetta Street Gate."  (Docket # 92 at 15).  The record does not support this contention, however.  Whitt testified that he was *concerned* that the workers were being exposed to "mag" asbestos without proper equipment and handling procedures.  (Tr. D 86-88.)  He did not testify, however, that he *observed* from his position outside the gate material that he recognized to be asbestos or to have characteristics consistent with asbestos.  In fact, when Whitt was asked what he had observed from outside the gate, Whitt responded that he had observed a "debris pile" that contained "construction debris," which he further defined to mean a mixture of materials.  (Tr. D. 87-88).

Whitt's observations from outside the fence simply do not provide an objectively reasonable basis to believe or even suspect that the workers were being exposed to asbestos.  *See Kerman*, 261 F.3d at 236 (warrantless entry based upon anonymous 911 call unlawful where officers did not conduct any investigation to confirm the call; "[b]ased on the absence of

evidence in the record to corroborate the 911 call and the protections afforded to private

dwellings under the Fourth Amendment, we find the officer's warrantless entry into [the

plaintiff's] apartment violated the Fourth Amendment"); *United States v. Bute*, 43 F.3d at 539

("[w]e simply cannot accept the notion that an open door of a commercial building at night is, in

and of itself, an occurrence that reasonably and objectively creates the impression of an

immediate threat to person or property as to justify a warrantless search of the premises");

*United States v. Chun Yen Chiu*, 857 F. Supp. 353, 361 (D.N.J. 1993) ("under the circumstances

of this case, the police had no indication that there was an actual fire or that there was any

imminent threat of a fire").

      Moreover, Whitt's conduct before and after his entry undercuts the government's

contention of exigency.  First, the record demonstrates that Whitt did not act immediately to

respond to the complaint.  The record suggests that the complaint was received at approximately

10:30 a.m.  (D. Ex. MM).  The complainant indicated that the dumpster at 920 Exchange Street

potentially contained "mag block" asbestos and that workers were currently working in the area

of the dumpster wearing dust masks.  (*Id.*).  Jakubowski called Whitt approximately

twenty-seven minutes after the complaint was received and instructed him to investigate the

complaint.  (Tr. B 10).  Whitt did not immediately travel to the site; rather, he arrived

approximately an hour after Jakubowski's call and approximately an hour and a half after the

complaint was received.  (Tr. B 10-11).  Whitt's time log suggests that he completed inspection

activities or paperwork relating to another site and may have eaten lunch before arriving at 920

Exchange Street.  (Tr. B 60-61; D. Ex. I).

      Even after Whitt arrived at the site and attracted the workers' attention, he did not

immediately call them over to the fence to warn them about the suspected asbestos.  Once he did

approach them, he questioned them in the vicinity of the dumpster.  After they left, Whitt entered

the property several more times without protective clothing – suggesting that any risk to persons

not handling the material was insubstantial.  In fact, Whitt and law enforcement officials

remained in the area outside the fence for hours after Whitt's entry and even requested that the

workers return to the area in order to be interviewed.  Law enforcement officers remained

outside of the property overnight in order to secure the scene until the warrant was obtained.

Nothing in the record suggests that the officers employed any special safety measures or donned

protective clothing while surveilling the property.

        Of course, the generally serious health risks posed by improper handling of

asbestos material cannot be understated, nor can the difficult decisions government officials are

called upon to make in responding to reports about potentially dangerous situations and

conditions.  Judging the entirety of the record in this case, however, I find that the government

has not demonstrated that Whitt's warrantless entry was justified by the emergency aid doctrine.

*See United States v. Davis*, 290 F.3d at 1243-44 (officers had no objectively reasonable basis to

find exigency based upon totality of circumstances); *Kerman*, 261 F.3d at 236 (warrantless entry

into home was not justified by exigent circumstances where officers responded to domestic 911

call and failed to corroborate the call prior to entering the home); *Bute*, 43 F.3d at 539 ("we have

little difficulty concluding whatever degree of suspicion or concern the open door may have

reasonably aroused in [the officer], that suspicion falls far short of that needed to justify the

warrantless entry into the [commercial] building").  The record simply does not establish that

Whitt could not have easily ameliorated the public safety risks – by persuading or directing the

workers to leave the property and remaining there until law enforcement officers arrived –

without entering the fenced area.  *See United States v. Chen Yen Chiu*, 857 F. Supp. at 361 (no

28

exigent circumstances existed where "alternative means existed to adequately ensure the safety of the[] individuals . . . while the police secured a warrant to enter the building").

The government's reliance upon *United States v. Nicoletti*, 870 F. Supp. 96, 100 (E.D. Pa. 1994), to support a contrary result is misplaced. In *Nicoletti*, a complainant called the pollution control center to report that asbestos-containing material was being discarded from windows of an unoccupied warehouse. *Id.* at 97. A pollution control inspector responded to the site to investigate the complaint and "observed pipes containing bits of asbestos being ejected out of its windows." *Id.* The inspector entered the warehouse and conducted an inspection. *Id.*

The court ruled that his entry was lawful because an "emergency existed." *Id.* at 100. The court reasoned that based upon "his experience and training," knowledge of the citizen complaint and personal "observ[ations of] pipes *containing asbestos* being cast out of the windows," the inspector "reasonably believed a potentially serious and immediate health hazard from friable asbestos existed," thus establishing "a satisfactory reason for securing immediate entry." *Id.* (emphasis added). The inspector in *Nicoletti*, unlike Whitt, observed asbestos prior to his entry. *Nicoletti*, 870 F. Supp. at 100. This salient and material difference renders the reasoning of *Nicoletti* inapplicable here.

## C.  Open Fields and Plain View Doctrines

The government's reliance on the open fields and plain view doctrines to justify Whitt's warrantless entry and search are no more availing than the consent and exigent circumstances doctrines. First, the government argues that Whitt observed the asbestos-containing material from his vantage point outside the locked gate and that his entry into the property and seizure of samples were permissible under the plain view doctrine. In order for the plain view doctrine to justify the warrantless seizure of evidence, however, "the officer

[must] be lawfully located in a place from which the [evidence] can be plainly seen, [and] he or she must also have a lawful right of access to the object itself." *Horton v. Cal.*, 496 U.S. 128, 137 (1990). As discussed at length above, the record demonstrates that Whitt observed a "debris pile" from his vantage point outside Violetta Street entrance, but not that he observed asbestos-containing material before he entered the fenced area. Accordingly, the plain view doctrine is also inapplicable.

Alternatively, the government relies on the open fields doctrine. It maintains that the parking lot should be considered an "open field," thus rendering unreasonable any expectation of privacy in it or its contents. Although an owner of commercial property enjoys a diminished expectation of privacy as compared to a homeowner, a "businessman, like the occupant of a residence, has a constitutional right to go about his business free from unreasonable official entries upon his private commercial property." *See v. City of Seattle*, 387 U.S. 541, 543 (1967). Given this diminished expectation of privacy, to preserve Fourth Amendment protection in its property, an owner of commercial property "must take the additional precaution of affirmatively barring the public from the area." *United States v. Hall*, 47 F.3d 1091, 1095 (11th Cir.), *cert. denied*, 516 U.S. 816 (1995); *see Air Pollution Variance Bd. of Colo. v. W. Alfalfa Corp.*, 416 U.S. 861, 865 (1974) ("[t]he field inspector was on respondent's property but we are not advised that he was on premises from which the public was excluded"). Accordingly, courts have routinely found no legitimate expectation of privacy in commercial parking lots that are shared with other businesses or from which the public is not excluded. *See, e.g.*, *United States v. Mathis*, 738 F.3d 719, 731 (6th Cir. 2013) (commercial site that was "unoccupied and undeveloped . . . , consisting of a partially demolished building and debris strewn throughout a paved lot," was an open field where owner "did not post any signs, erect a

fence, or other barrier, hire a security guard, or monitor the site to exclude others"); *United States v. Elkins*, 300 F.3d 638, 653-54 (6th Cir. 2002) (paved path next to business structure was an open field despite presence of a "no trespassing" sign where the area was visible from the street and "[no] gates or fences shielded the area"); *United States v. Tolar*, 268 F.3d 530, 532 (7th Cir. 2001) (no privacy interest in commercial parking lot surrounded by a chain-link fence with an open gate; "[a]n open gate invites entry, and a chain-link fence does little to assert a privacy interest (as opposed to a property interest) in details visible from outside the fence), *cert. denied*, 534 U.S. 1163 (2002); *United States v. Hall*, 47 F.3d at 1096 ("[a] commercial proprietor incurs a similarly diminished expectation of privacy when garbage is placed in a dumpster which is located in a parking lot that the business shares with other businesses, and no steps are taken to limit the public's access to the dumpster"); *United States v. Dunkel*, 900 F.2d 105, 106-07 (7th Cir. 1990) (no expectation of privacy in dumpster located fifty-five feet from commercial building where the dumpster was used by multiple businesses and was located in a parking lot that was accessible to the public), *remanded on other grounds*, 498 U.S. 1043 (1991); *United States v. Reed*, 733 F.2d 492, 501 (8th Cir. 1984) (no reasonable expectation of privacy in parking lot and loading area that "were visible from the streets on the east and south side; and the fenced gate to the lot was completely open, providing a . . . wide access path to and from the public street located immediately south of the [building]"); *United States v. Chopra*, 2014 WL 6810564, *18-19 (W.D.N.Y. 2014) (no reasonable expectation of privacy in dumpster located in a parking lot that was shared with other building tenants where the officers entered the lot through open gates); *United States v. Skruck*, 2014 WL 6883073, *4 (N.D. W. Va. 2014) (no expectation of privacy in unlocked dumpster located approximately twenty-five feet from

commercial business where defendant "clearly did not control the dumpster in a manner that excluded the public").

Although I credit Whitt's testimony that he entered the property through an opening in the fence without having to climb over any fences, I do not credit his testimony that the fence surrounding the parking lot at 920 Exchange Street ended at the northwest corner of the property. (Tr. A 68-71, 73; G. Ex. 15A). Instead, the photographs and testimony demonstrate that the fence continued at a right degree angle parallel to Exchange Street, behind the residential houses. (Tr. C 10, 12, 14, 18; D. Exs. O-Y). Thus, I conclude that the parking lot at 920 Exchange Street, with the exception of a small gap behind two residential houses, was surrounded by chain-link fencing.[10] Indeed, in her affidavit Rivera described the property at 920 Exchange Street as being "surrounded by a chain link fence which was secured with a lock and chain." (Docket # 36-1 at ¶ 31). Accordingly, I find that the owner of 920 Exchange Street took reasonable steps to block the public's access to his property. Those steps included locked gates at the only two entrances to the parking lot and a chain-link fence surrounding the property. Under these circumstances, I am not persuaded that the parking lot is sufficiently analogous to an open field to justify application of the open fields doctrine.[11] *See United States v. Swart*, 679

---

[10]   The government maintains that there was "an entire area of the property where there was no fence at all." (Docket # 92 at 16). In support of its contention, the government cites ambiguous testimony by Resnick in which he seemingly conceded during cross-examination that there was no fence in the area to the left of the fence line running between the two residential houses that Resnick had drawn on Exhibit FF. (*Id.* citing Tr. C at 26 and D. Ex. FF). I have carefully read Resnick's testimony and reviewed the photographs of the fence at the property. None of the photographs appear to depict the fencing in the area to the left of the hand-drawn fence depicted in Exhibit FF. As discussed above, Resnick's testimony, Rivera's description of the property and the photographs demonstrate that the parking lot at 920 Exchange Street was surrounded by chain-link fencing with the exception of a gap that existed behind the residential houses. In my view, the record does not provide sufficient evidence to permit a finding that there was an entire unfenced portion of property behind the residential houses.

[11]   Several courts correctly note that the mere presence or absence of fences or "No Trespassing" signs cannot transform an open field into property protected by the Fourth Amendment. *See, e.g., Oliver v. United States*, 466 U.S. 170, 182-83 (1984) (woods behind residence were an open field despite fences and no trespassing signs; "the test of legitimacy is not whether the individual chooses to conceal assertedly 'private' activity[;] [r]ather, the correct inquiry is whether the government's intrusion infringes upon the personal and societal values protected by

F.2d 698, 702 (7th Cir. 1982) ("this case does not involve an open field but outside business premises that were closed for the day"); *Pearl Meadows Mushroom Farm, Inc. v. Nelson*, 723 F. Supp. 432, 441 (N.D. Cal. 1989) ("[t]he Court finds that [the business's] reasonable expectations of privacy entailed an expectation to be free from physical entry onto fenced off business premises, where production work takes place, and the public is not granted access"); *United States v. FMC Corp.*, 428 F. Supp. 615, 618 (W.D.N.Y. 1977) ("[d]efendant's . . . plant includes a completely fenced-in facility of approximately 100 acres and a separately fenced lagoon of approximately 10 acres[;] . . . [t]his court finds that the highly restricted access to the lagoon and the manner in which it was enclosed do not permit application of the 'open fields' exception in this case"), *rejected on other grounds*, 65 F.3d 252 (2d Cir. 1995).[12]

### D.  Code Rule 56

The government contends that Whitt was permitted to conduct a warrantless inspection of 920 Exchange Street pursuant to Code Rule 56, a provision contained within Part 56 of Title 12 of the New York Code of Rules and Regulations.  *See* 12 N.Y.C.R.R. §§ 56-12.4. The purpose of Part 56 is "to reduce the risks to the public associated with exposure to asbestos."

---

the Fourth Amendment"); *United States v. Rapanos*, 115 F.3d 367, 372-73 (6th Cir.) (175 acre property was an open field despite being surrounded by a fence; "[t]he rather typical presence of fences, closed or locked gates, and "No Trespassing" signs on an otherwise open field therefore has no constitutional import"), *cert. denied*, 522 U.S. 917 (1997); *McLaughlin v. Elsberry, Inc.*, 868 F.2d 1525, 1526, 1530 (11th Cir. 1988) (approximately 2,500 acres of cultivated fields and labor camps constituted an open field; "[n]either ordinary farm fences nor "No Trespassing" signs are sufficient to confer a reasonable expectation of privacy in activities taking place in otherwise open fields[;] . . . [t]his is equally true of property utilized in agricultural business"); *Walker v. Wegener*, 2012 WL 4359365, *14 (D. Colo.) (160 acre ranch was an open field; "whether a parcel of land constitutes open fields is unaffected by attempts to conceal criminal activity, such as limiting those activities to secluded land, erecting fences, or posting "No Trespassing" signs"), *report and recommendation adopted*, 2012 WL 4355621 (D. Colo. 2012).

[12]  The government has not specifically argued that Whitt's entry was justified under the special needs doctrine despite being provided ample opportunities to identify and articulate justifications for Whitt's warrantless entry.  (Docket # 91 at 15).  *See, e.g., Palmieri v. Lynch*, 392 F.3d 73, 86 (2d Cir. 2004) ("an environmental regulatory scheme involving warrantless searches *may* be subject to a special needs fact-specific balancing test . . . [where] the Government's need to discover . . . latent or hidden conditions, or to prevent their development, is sufficiently compelling to justify the intrusion on privacy entailed . . . without any measure of individualized suspicion"), *cert. denied*, 546 U.S. 937 (2005).  Nor has the government cited the *Palmieri* decision.

12 N.Y.C.R.R. § 56-1.2.  In general, the Part applies to any individuals, government agencies or companies that engage or employ persons who engage in "asbestos projects," other than asbestos projects conducted by an owner of an "owner-occupied single-family dwelling."  12 N.Y.C.R.R. § 56-1.3.  An "asbestos project" includes any "[w]ork that involves the removal, encapsulation, enclosure, repair or disturbance of friable or non-friable asbestos, or any handling of asbestos material that may result in the release of asbestos fibers."  12 N.Y.C.R.R. § 56-2.1(w).  The Part requires that persons or companies (i.e., the "asbestos contractor") engaging in asbestos projects obtain licenses and certifications prior to commencing the project.  12 N.Y.C.R.R. §§ 56-2.1(q), 56-3.1, 56-3.2.  The Part also provides permissible procedures for handling and disposing of asbestos-containing material.  12 N.Y.C.R.R. §§ 56-8.1 – 56-10.4.

Part 56 also contains a provision permitting entry into any asbestos project ("Code Rule 56").  That rule provides:

> The Commissioner[13] or officers and employees of the Department[14] shall at any time, from commencement to completion of any asbestos project, have the right to enter any part of such project, or at another time for complaint investigation.  Refusal to permit such entry may result in application of appropriate penalties set forth in statute and code including enjoining further work on the project.

12 N.Y.C.R.R. § 56-12.4.

According to the government, Code Rule 56 authorized Whitt's entry onto the premises without a warrant.  Kolokouris disagrees, maintaining that neither he, nor his property, was engaged in a closely or pervasively regulated industry, a prerequisite for a warrantless administrative search.  (Docket ## 36- 2 at 10-11, 62 at 18- 23, 70 at 9- 14).  Alternatively,

---

[13]  The "Commissioner" means the Commissioner of the New York State Department of Labor.  12 N.Y.C.R.R. § 56-2.1(aq).

[14]  The "Department" means the New York State Department of Labor.  12 N.Y.C.R.R. § 56-2.1(aw).

Kolokouris contends that Code Rule 56 is facially unconstitutional because it fails to sufficiently limit the discretion of the inspecting officials.  (Docket ## 36-2 at 11-12, 62 at 24-27, 70 at 13-14).  The government maintains that Code Rule 56 is constitutional, but even if it is not, suppression is not warranted because Whitt relied upon the rule in good faith.  (Docket ## 76; 92 at 30-34).  Kolokouris counters that the record is insufficient to demonstrate either that Whitt actually relied upon Code Rule 56 or that such reliance was in good faith.  (Docket ## 36-2 at 12-14; 70 at 2-8; 93 at 32-39).

In general, the Fourth Amendment prohibits warrantless searches of commercial property for both criminal investigations and administrative inspections.  *New York v. Burger*, 482 U.S. 691, 700 (1987) (citing *Marshall v. Barlow's, Inc.*, 436 U.S. 307, 312 (1978)).  An exception exists, however, permitting warrantless searches of closely or pervasively regulated industries.[15]  *Anobile v. Pelligrino*, 303 F.3d 107, 117 (2d Cir. 2002).  The rationale for the exception is grounded in the owner's reduced expectation of privacy, which justifies a relaxed standard permitting a warrantless search of the commercial property.  *See City of Los Angeles v. Patel*, 135 S. Ct. 2443, 2454 (2015); *New York v. Burger*, 482 U.S. at 702 ("[b]ecause the owner or operator of commercial premises in a 'closely regulated' industry has a reduced expectation of privacy, the warrant and probable-cause requirements . . . have lessened application").  This diminished expectation of privacy is "premised on the fact that the *owner* of the property subject to the search cannot help but be aware that his property will be subject to periodic [administrative] inspections undertaken for specific purposes," because he or she is "knowingly and voluntarily engaging in a pervasively regulated business, [for which there] exist[s] . . . a statutory scheme that puts that individual on notice that he will be subject to warrantless administrative seizures and searches."  *United States v. Herrera*, 444 F.3d 1238, 1246-47 (10th

---

[15]  Courts appear to use the terms "closely" and "pervasively" interchangeably.

Cir. 2006) (internal quotations omitted); *see Marshall v. Barlow's, Inc.*, 436 U.S. at 313 ("[t]he element that distinguishes these enterprises from ordinary businesses is a long tradition of close government supervision, of which any person who chooses to enter such a business must already be aware").

There is no clearly defined test used to determine whether a particular business is closely regulated. *See Burger*, 482 U.S. at 703-04. Closely or pervasively regulated businesses are the exception rather than the rule, and businesses that fall within the category generally pose an inherent risk of danger to the public welfare. *City of Los Angeles v. Patel*, 135 S. Ct. at 2454-55. Although the Supreme Court recently noted that it has identified only a handful of industries as closely regulated, Justice Scalia recognized that lower courts have identified far more. *Id.* at 2461 (Scalia, J., dissenting) (collecting cases).

The pervasiveness of the government's regulation of a particular industry is relevant to the calculus. *See id.* at 2454-55; *Marshall v. Wait*, 628 F.2d 1255, 1258 (9th Cir. 1980) ("[o]f perhaps equal importance is the pervasiveness of federal regulation and the public interest in enforcement"). Further, the history or duration of the government's regulation of the industry is informative, although not dispositive. *See Burger*, 482 U.S. at 705 ("[i]n determining whether [a particular industry] constitute[s] a 'closely regulated' industry, the 'duration of [this] particular regulatory scheme . . . has some relevancy") (internal citation omitted) (quoting *Donovan v. Dewey*, 452 U.S. 594, 606 (1981)). Finally, the statute at issue must regulate a particular industry rather than apply generally to all businesses. *See V-1 Oil Co. v. State of Wyo., Dep't of Envtl. Quality*, 902 F.2d 1482, 1487 (10th Cir.) (collecting cases including *Barlow's, Inc.*, 436 U.S. at 313-14), *cert. denied*, 498 U.S. 920 (1990)); *Rush v. Obledo*, 756 F.2d 713, 718-19 (9th Cir. 1985) ("[p]ersons successfully protesting warrantless searches were not engaged

in any regulated or licensed businesses, but were subjected to such searches pursuant to general

regulatory schemes which indiscriminately covered many different businesses or covered

conditions in private residences or automobiles").

Even if a business is properly characterized as closely regulated, a warrantless

administrative search is constitutionally permissible only if the regulatory scheme authorizing

the warrantless search meets three additional criteria:

> [1]     First, there must be a 'substantial' government
> interest that informs the regulatory scheme pursuant
> to which the inspection is made[;]
>
> [2]     Second, the warrantless inspections must be
> necessary to further [the] regulatory scheme[;] [and]
>
> [3]     Finally, the statute's inspection program, in terms of
> the certainty and regularity of its application, [must]
> provid[e] a constitutionally adequate substitute for a
> warrant . . . [by] advis[ing] the owner of the
> commercial premises that the search is being made
> pursuant to the law and has a properly defined
> scope, and it must limit the discretion of the
> inspecting officers.

*Anobile v. Pelligrino*, 303 F.3d at 117-18 (internal quotations omitted).

Having carefully reviewed the relevant case law and the regulatory language, I

find that the constitutionality of warrantless administrative searches conducted pursuant to Code

Rule 56 is an extremely difficult determination.  The first difficult issue is whether the conduct

occurring at 920 Exchange Street may properly be categorized as part of a closely regulated

industry.

On the one hand, Kolokouris compellingly argues that the proper inquiry should

be whether the business located at 920 Exchange Street was part of a closely regulated *industry*,

not whether a particular closely regulated *activity* was conducted at the premises.  (Docket ## 62

at 22-24; 70 at 9-13).  Kolokouris maintains that Code Rule 56, which regulates demolition or

construction projects involving asbestos-containing materials, applies to both closely regulated

and not closely regulated businesses alike, and thus regulates an activity not a particular industry.

Accordingly, Kolokouris contends that Code Rule 56 is a regulation of general applicability

because it permits warrantless inspections of any businesses that are located in a building

containing asbestos that requires renovation.  Kolokouris's position finds some support in the

caselaw.  *See Barlow's, Inc.*, 436 U.S. at 313-14 (warrant required for administrative search

pursuant to OSHA because the act applies both to closely regulated and not closely regulated

industries); *V-1 Oil Co. v. State of Wyo.*, *Dep't of Envtl. Quality*, 902 F.2d at 1487 ("because the

Act applies to every business in Wyoming, it provides no notice whatsoever to the owner of any

particular business that his or her property will be subject to warrantless inspections[;] . . .

[a]dministrative searches conducted pursuant to statutes of general applicability require search

warrants"); *United States v. Hajduk*, 396 F. Supp. 2d 1216, 1236 (D. Colo. 2005) ("[t]he statute

here, [the Clean Water Act], is a general purpose environmental law applied to industrial

companies[;] I am unaware of any precedent for declaring that a business is subject to

warrantless administrative searches as 'closely regulated' solely because it is subject to general

purpose environmental laws"); *Nicoletti*, 870 F. Supp. at 100 n.1 (search of building pursuant to

a complaint of suspected asbestos removal did not involve a search of a closely regulated

business).

     On the other hand, the government argues that asbestos-related construction or

demolition work should be considered a discrete industry, properly subject to Code Rule 56

inspections.  As noted by the government, asbestos and asbestos-containing materials have a

history of substantial federal and state regulation.  Indeed, over ten years ago, the Second Circuit

recognized the pervasiveness of regulations applying to asbestos, albeit in a different context. *United States v. Weintraub*, 273 F.3d 139, 149-50 (2d Cir. 2001) ("asbestos is strictly regulated at the local, state, and federal levels").  According to the Second Circuit, the risk posed by asbestos to the public health was first identified in the mid-twentieth century and, since that time, "public control of asbestos has become pervasive."  *See id.* at 150 (collecting federal and state statutes and regulations pertaining to asbestos).  Indeed, the Second Circuit concluded that "no reasonable person . . . could be unaware that asbestos in almost all of its applications is closely regulated."  *Id.* at 149.

Additionally, the government maintains that the relevant inquiry is whether the industry of handling and disposing of asbestos, rather than the industry in which the business occupying the commercial property is engaged, is closely regulated – an interpretation that also finds some support in the caselaw.[16]  *See United States v. 4,432 Mastercases of Cigarettes, More or Less*, 448 F.3d 1168, 1177 (9th Cir. 2006) ("[a]lthough storing cigarettes in a [foreign trade zone] is more akin to a 'business activity' than an 'industry,' we have previously approved administrative searches premised on the 'closely regulated' nature of a particular commercial activity, even where the entire industry might not be tightly regulated") (citing *United States v. V-1 Oil Co.*, 63 F.3d 909, 911 (9th Cir. 1995) ("[defendant] has a reduced expectation of privacy because it transports, stores, and sells propane gas"), *cert. denied*, 517 U.S. 1208 (1996) and *United States v. Gonsalves*, 435 F.3d 64, 67 (1st Cir. 2006) ("[w]hatever the status of the

---

[16]   The fact that Kolokouris allegedly did not comply with the licensing, certification and permitting requirements of applicable state and federal laws prior to commencing an asbestos project on his property is ultimately immaterial.  *See United States v. Litvin*, 353 F. Supp. 1333, 1336 (D.D.C. 1973) ("[a]lthough the defendants in the present case are not licensed, . . . the defendants' business nevertheless is subject to the comprehensive, vigorously enforced regulations of the Food and Drug Administration"); *United States v. Del Campo Baking Mfg. Co.*, 345 F. Supp. 1371, 1377 (D. Del. 1972) ("[t]he fact that Congress has not required the [defendant] business to obtain federal licenses to operate is wholly immaterial[;] . . . [n]o rational or valid distinction can be drawn for compliance inspections between a federally licensed business and one so completely regulated by the Act under the commerce power").

[medical] profession in the abstract," the manufacture, storage, and dispensation of pharmaceuticals is closely regulated)); *Players, Inc. v. City of New York*, 371 F. Supp. 2d  522, 537 (S.D.N.Y. 2005) (local law permitting inspections for compliance with smoking ban constitutionally applied to private social club that was a licensed food establishment; "[a]s many courts have held and as [plaintiff] does not contest, the food industry is a quintessential example of an industry that is 'closely regulated'").  Under the government's view of the law, an applicant who receives a permit to conduct asbestos-removal work is knowingly participating in a heavily regulated industry and is thus subject to warrantless inspections.[17]  Indeed, the Third Circuit upheld a warrantless administrative search of residential property pursuant to a local building code that permitted a warrantless inspection at any reasonable hour during a construction project to ensure compliance with building codes.  *Frey v. Panza*, 621 F.2d 596, 597 (3d Cir.), *cert. denied*, 449 U.S. 1035 (1980).  According to the Third Circuit, "the construction industry has a long history of governmental supervision and oversight," and the challenged statute was "directed specifically and exclusively at that one industry."  *Id*. at 598.

Kolokouris's constitutional challenge to Code Rule 56 on the grounds that it does not sufficiently limit the discretion of the inspectors is an equally close question.[18]  On the one hand, Code Rule 56 appears to permit inspections at any time of the day and does not prescribe with any specificity the items or objects to be searched or the purpose of the search.  Although

---

[17]  My conclusion that Whitt did not have an objectively reasonable basis upon which to conclude that the activity he observed at 920 Exchange Street involved asbestos-containing materials from outside the gate does not alter the analysis because the relevant inquiry is whether Kolokouris – not Whitt – was on notice that the conduct occurring on his property would subject the property to a warrantless inspection.  *See United States v. Herrera*, 444 F.3d at 1246-47 ("[t]he validity of an administrative seizure and search does not turn on whether or not the [government official] had an objectively reasonable belief that [the property was] subject to random inspections[;] [r]ather, it turns on [the defendant's] decision to engage in a pervasively regulated business, knowing that by doing so he would be subject to random warrantless inspections").

[18]  Kolokouris does not challenge, and this Court does not address, whether Code Rule 56 satisfies the remaining two criteria.

the government correctly notes that a defendant raising a facial constitutional challenge to legislation faces an "uphill battle," (Docket # 65 at 7), several courts have found statutes or regulations permitting warrantless inspections unconstitutional based upon their failure to adequately limit the discretion of the executing officials.  *See, e.g.*, *Patel*, 135 S. Ct. at 2451, 2456 ("when addressing a facial challenge to a statute authorizing warrantless searches, the proper focus of the constitutional inquiry is searches that the law actually authorizes, not those for which it is irrelevant[;] . . . [the municipal code provision] is also constitutionally deficient . . . because it fails sufficiently to constrain police officers' discretion as to which hotels to search and under what circumstances"); *V-1 Oil Co.*, 902 F.2d at 1487 (state statute did not provide a constitutionally adequate substitute for a warrant where it left "inspectors free to inspect any business as often or seldom as he or she pleases"); *Allinder v. State of Ohio*, 808 F.2d 1180, 1188 (6th Cir.) (statute permitting warrantless inspections unconstitutional where it did not provide "certainty, regularity and fairness," was "ripe for potential abuse," and did not "tailor the scope and frequency of such administrative inspections to the particular purpose" of the statute) (internal quotations omitted), *appeal dismissed*, 481 U.S. 1065 (1987); *Rush v. Obledo*, 756 F.2d 713, 721 (9th Cir. 1985) (statute authorizing warrantless inspection of family day care homes failed to limit the inspector's discretion because it permitted inspections at any time, day or night and did not limit the inspection to "those portions of the provider's home where day care activities take place").

On the other hand, although Code Rule 56 does not limit warrantless inspections to particular hours of the day, it does not permit an inspection of "any premises, at any time, and for any reason," as Kolokouris suggests (Docket # 362 at 11).  Rather, it authorizes warrantless inspections only during an ongoing asbestos project or to investigate a complaint concerning an

41

asbestos project. *See Rivera-Corraliza v. Morales*, 2015 WL 4461323, *9-10 (1st Cir. 2015) ("a

regime may pass the *Burger* test even if there are no time limits – context is key, with precedent

out there in 2010 okaying schemes with no timing limits if such limits would make inspections

unworkable[;] . . . [w]hat matters then is whether the problems that triggered the [regulation] are

limited to certain hours, like business hours"); *United States v. Soto*, 498 F. Supp. 2d 1041, 1046

(W.D. Mich. 2007) ("while the statute does not limit the time when an inspection may be

conducted, such as during regular business hours . . . , such a limitation would be unreasonable

and unworkable in the world of commercial trucking which . . . operates twenty-four hours a day

throughout the nation").  Further, although the inspectors are seemingly free to inspect anything

within the area of the asbestos project, the scope of the inspection is geographically limited to the

portion of the premises containing the asbestos project. *United States v. Galvan*, 2011 WL

482877, *5 (E.D. Ky. 2011) (state statute adequately limited scope of search by permitting

search of only "vehicles within the purview of the statutes" for "the purpose of ascertaining

whether or not any provision of this chapter . . . has been violated"); *United States v. Soto*, 498

F. Supp. 2d at 1046 ("the statute prescribes . . . what may be searched . . .[;] the search is limited

to a commercial vehicle").  Finally, the government employees who may conduct the inspections

are limited to the Commissioner or employees of the DOL.  *See United States v. Steed*, 548 F.3d

961, 971 (11th Cir. 2008) ("the Alabama statute and the federal regulations are favorable in this

respect because, unlike the New York statute upheld in *Burger*, they more specifically designate

which officials may conduct inspections"); *United States v. Galvan*, 2011 WL 482877 at *5

(state statute "limits who may search" to "[t]he Department of Kentucky State Police or any

other peace officer designated by the department"); *Soto*, 498 F. Supp. 2d at 1046 ("the statute

42

prescribes who may search [to] . . . only a peace officer or an enforcement member of the motor carrier division of the state police").

In sum, these very close constitutional questions – whether Code Rule 56 applies to a closely regulated industry and sufficiently limits the discretion of the inspecting officials – need not be resolved because as discussed in length below, Whitt's "good-faith reliance on [Code Rule 56's] validity was objectively reasonable under the Supreme Court's decision in [*Illinois v. Krull*, 480 U.S. 340 (1987)]." *United States v. Steed*, 548 F.3d at 968 (declining to determine whether statute provided a constitutionally adequate substitute for a warrant where it concluded that the government official relied upon the statute in objective good faith) (citing *United States v. Cardenas-Alatorre*, 485 F.3d 1111, 1115 & n.9 (10th Cir.) (electing to rely on *Krull's* good faith exception – and assuming without deciding that the statute at issue was unconstitutional – because such an approach was consistent with the canon of constitutional avoidance), *cert. denied*, 552 U.S. 966 (2007)).

"Under the good faith exception to the exclusionary rule, evidence obtained by an officer acting in objectively reasonable reliance on a statute will be admitted unless the statute was 'clearly unconstitutional' at the time that the officer obtained the evidence." *United States v. McCullough*, 523 F. App'x 82, 83 (2d Cir. 2013) (quoting *Illinois v. Krull*, 480 U.S. at 349-50). As the Supreme Court reasoned in *Krull*:

> The application of the exclusionary rule to suppress evidence obtained by an officer acting in objectively reasonable reliance on a statute would have as little deterrent effect on the officer's actions as would the exclusion of evidence when an officer acts in objectively reasonable reliance on a warrant. Unless a statute is clearly unconstitutional, an officer cannot be expected to question the judgment of the legislature that passed the law. If the statute is subsequently declared unconstitutional, excluding evidence obtained pursuant to it prior to such a judicial declaration will not

> deter future Fourth Amendment violations by an officer who has
> simply fulfilled his responsibility to enforce the statute as written.

*Krull*, 480 U.S. at 349-50.  If, however, the statute's "provisions are such that a reasonable

officer should have known that the statute was unconstitutional," then the good faith exception

will not apply.  *Id.* at 355.  Thus, in considering the applicability of *Krull*, courts examine the

challenged statute not to determine whether it is constitutional, but "only to determine whether it

was so 'clearly unconstitutional' that the police could not in good faith have relied on it."  *United*

*States v. Stowe*, 100 F.3d 494, 498 (7th Cir. 1996), *cert. denied*, 520 U.S. 1171 (1997); *see also*

*Steed*, 548 F.3d at 969; *United States v. Vanness*, 342 F.3d 1093, 1099 (10th Cir. 2003) ("we do

not decide the constitutionality of the [noise] ordinance, but merely that it was objectively

reasonable for the officers to rely on the noise ordinance").  The standard of reasonable reliance

is an objective one that "does not turn on the subjective good faith of individual officers."  *Krull*,

480 U.S. at 355.

Kolokouris maintains that the government has failed to establish that Whitt relied

on Code Rule 56 when entering the property or that any such reliance was in objective good

faith.  First, Kolokouris maintains that the good faith exception does not apply when government

officials rely upon agency-promulgated regulations as opposed to statutes enacted by a

legislative body.  (Docket ## 70 at 2-4; 93 at 32).  Next, Kolokouris maintains that Code Rule 56

is so plainly unconstitutional, that reliance upon it would be objectively unreasonable.  (Docket #

70 at 6-7).  Third, Kolokouris contends that there is insufficient evidence demonstrating that

Whitt consciously relied upon Code Rule 56 when entering the property, arguing that his conduct

at the site and his failure to reference the rule in his reports or discussions with Rivera suggest

that he did not actually rely upon the rule.  (Docket ## 36-2 at 12-14; 93 at 33-34).  Finally,

Kolokouris argues that any reliance upon Code Rule 56 by Whitt was not in good faith because

44

he failed to follow DOL and OSHA guidance and procedures for inspections.  (Docket ## 70 at

5-8; 93 at 34-35).  To the extent that Whitt relied upon the Asbestos Control Bureau manual for

guidance, Kolokouris maintains that such reliance was not in good faith because the other

operational manuals provide specific guidance for authority to conduct inspections and because

Whitt ignored or failed to comply with certain provisions contained within the Asbestos Control

Bureau manual.  (Docket # 93 at 35-39).  In any event, Kolokouris argues that the evidence

demonstrates that the Asbestos Control Bureau manual is not used to conduct asbestos

inspections.[19]  (Docket # 93 at 35-36).

   As an initial matter, I conclude that the exclusionary rule should not apply where

a government official acts in good-faith reliance on an agency-promulgated regulation.  "The

basic insight of the [good faith] line of cases is that the deterrence benefits of exclusion var[y]

with the culpability of the law enforcement conduct at issue."  *Davis v. United States*, 131 S. Ct.

2419, 2427 (2011). (internal quotation omitted).

> As the Supreme Court has recognized,
>
> Police are charged to enforce laws until and unless they are
> declared unconstitutional.  The enactment of a law forecloses
> speculation by enforcement officers concerning its constitutionality
> – with the possible exception of a law so grossly and flagrantly
> unconstitutional that any person of reasonable prudence would be
> bound to see its flaws.  Society would be ill-served if its police
> officers took it upon themselves to determine which laws are and
> which are not constitutionally entitled to enforcement.

*Michigan v. DeFillippo*, 443 U.S. 31, 38 (1979); *see United States v. Cardenas-Alatorre*, 485

F.3d at 1117 ("[r]easonable officers . . . enforce the legislative enactments they are given and do

---

[19]  Kolokouris also maintains that the good faith exception does not apply because the government failed to
disclose the manner of Whitt's entry when it applied for a warrant to search the premises.  (Docket ## 36-2 at 14-17;
62 at 27-34; 93 at 32).  Although this argument might provide a basis for excluding evidence seized pursuant to the
warrant, it does not provide a basis for concluding that Whitt could not rely upon Code Rule 56 in good faith.

not arrogate to themselves the right to second guess the people's representatives, except in the most extreme of cases").

I conclude that the rationale supporting application of the good faith exception also applies to agency-promulgated regulations. Accordingly, I conclude that exclusion would not be appropriate if Whitt relied in good faith upon the validity of Code Rule 56. *See Anobile v. Pelligrino*, 303 F.3d at 118 ("the warrantless search exception applies to searches authorized pursuant to valid agency regulations, as well as to statutes"); *United States v. Ortiz*, 714 F. Supp. 1569, 1579-80 (C.D. Cal. 1989) (application of exclusionary rule not justified where agent acted in good-faith reliance on agency promulgated regulation), *aff'd*, 899 F.2d 19 (9th Cir. 1990).

Kolokouris has not cited, and this Court has been unable to identify, any cases addressing or determining the constitutionality of Code Rule 56. As discussed at length above, the constitutionality of Code Rule 56 raises difficult legal issues that are not easily resolved. I find that a reasonably well-trained inspector[20] would not have known that the DOL's determination that it could perform warrantless administrative inspections of asbestos projects was clearly unconstitutional. In other words, I find that Code Rule 56, even if it were unconstitutional, is not so clearly unconstitutional that Whitt's reliance upon it was objectively unreasonable. *United States v. Warshak*, 631 F.3d 266, 289 (6th Cir. 2010) ("given the complicated thicket of issues that we were required to navigate when passing on the constitutionality of the [statute], it was not plain or obvious that the [statute] was unconstitutional, and it was therefore reasonable for the government to rely upon the [statute]"); *United States v. Steed*, 548 F.3d at 974 (statute permitting warrantless inspection was not

---

[20] *See United States v. Leon*, 468 U.S. 897, 922 n.23 (1984) ("our good-faith inquiry is confined to the objectively ascertainable question whether a reasonably well trained officer would have known that the [seizure] was illegal"); *United States v. Steed*, 548 F.3d at 974 ("we evaluate the objective reasonableness of [the officer's] reliance on the statute under a 'reasonably well-trained officer' standard as opposed to a 'reasonable jurist' standard").

"clearly unconstitutional" despite lacking time or place limitations; "even if the statute fails *Burger's* third prong, [the officer's] good-faith reliance on the statute's validity was objectively reasonable under the Supreme Court's decision in *Krull*"); *United States v. Galvan*, 2011 WL 482877 at *6 ("[u]ltimately, considering the constitutional analysis above, the Court cannot say that the statute is so lacking in restraint on officers' discretion as to be flagrantly unconstitutional") (internal quotations omitted).

I find Kolokouris's remaining arguments unavailing. In this case, while Whitt testified that he believed that he had obtained consent to enter the property, he also testified that he was "operating under Code Rule 56" when he conducted the inspection at 920 Exchange Street. (Tr. D at 12). Further, although Whitt conceded that he did not include a citation to Code Rule 56 in his report, he also testified that he never cited regulations in his paperwork unless he was writing a violation. (Tr. D 42-43).

Kolokouris maintains that Whitt's conduct at 920 Exchange Street, including his entry through a gap in the fencing and his decision to contact the real estate agent to obtain "access" to the site, suggests that he did not enter the property pursuant to his authority under Code Rule 56. I disagree. The fact that he chose to enter the property in a manner less likely to be directly confrontational than a demand that the workers accede to his authority to enter does not refute his belief that he had the authority to enter the property with or without their permission.

Kolokouris describes in detail guidance contained in DOL and OSHA field manuals, contending that Whitt could not have acted in good faith because his conduct violated guidance contained in those manuals. However, Whitt credibly testified that the DOL and

47

OSHA field manuals do not apply to asbestos inspections.  According to Whitt, he conducted his inspection consistent with the guidance contained in the Asbestos Control Bureau manual.[21]

Recognizing that Whitt was operating pursuant to a different set of guidelines, Kolokouris unsuccessfully attempts to discredit Whitt's reliance on the Asbestos Control Bureau manual.  First, Kolokouris argues that reliance on this manual is not reasonable because Coniglio testified that despite his experience with asbestos-related abatement and construction projects, he had never encountered the manual.  Coniglio testified that he had never worked for the DOL or the Asbestos Control Bureau and had never conducted an asbestos-related complaint inspection.  Coniglio's unfamiliarity with the manual is not a compelling basis for rejecting Whitt's testimony that he was operating under the guidelines contained in that manual.

Finally, Kolokouris argues that even if Whitt was operating pursuant to the guidance set forth in the Asbestos Control Bureau manual, his inspection was not conducted in good faith because he disregarded several protocols contained within the manual during his inspection.  (Docket # 93 at 37-38).  Whitt's purported failures primarily include his failure to take adequate notes, prepare for the inspection, complete paperwork, have the manual with him during the inspection and to follow the proper chain of command.  Whitt's alleged failure to adhere precisely to every procedure in the manual does not invalidate his good-faith reliance on Code Rule 56.  Under the circumstances presented here, I find that Whitt's reliance Code Rule 56 was objectively reasonable and forecloses application of the exclusionary rule.

---

[21]  The government objected to the admission of the New York State Department of Labor Public Employee Safety and Health Manual (D. Ex. GG) and the Federal OSHA Field Manual (D. Ex. HH) on the grounds that Whitt testified that he was not operating pursuant to either manual.  (Docket # 92 at 35 n.13).  The government also urges the Court to reject the testimony provided by Coniglio on relevance grounds.  (*Id.* at 35-36).  I need not reach these evidentiary issues because, even considering the testimony and exhibits, I conclude that Whitt relied upon Code Rule 56 in good faith.

II.     **Suppression Under *Wong Sun***

As discussed above, I conclude that Whitt lawfully entered the property based upon his good-faith reliance on the validity of Code Rule 56.   Nevertheless, even if his warrantless entry had been unlawful, suppression would not be warranted.   Instead, as discussed below, I find that the December 14, 2011 search was authorized by a valid warrant supported by probable cause independent of Whitt's warrantless entry.

"The exclusionary rule prohibits introduction into evidence of tangible materials seized during an unlawful search, and of testimony concerning knowledge acquired during an unlawful search." *Murray v. United States*, 487 U.S. 533, 536-37 (1988) (internal citations omitted); *see Wong Sun v. United States*, 371 U.S. 471, 484-85 (1963); *United States v. Scopo*, 19 F.3d 777, 781 (2d Cir.), *cert. denied*, 513 U.S. 877 (1994).   This doctrine applies not only to direct evidence, but also to tangible and testimonial evidence derived from the tainted evidence "up to the point at which the connection with the unlawful search becomes so attenuated as to dissipate the taint." *Id.* at 537 (internal quotation omitted).

In this case, a federal search warrant was obtained following the warrantless entry into 920 Exchange Street.  (Docket # 36-1).   Anticipating that the government would seek to rely upon the subsequently-issued warrant, Kolokouris contends that the search warrant was based upon information discovered during the unlawful entry and the warrant was thus not independent of the unlawful entry.[22]   (Docket # 93 at 28-29, 40-48).   The government also contends that even if the warrant was invalid, the officers relied upon it in good faith.  (Docket # 65 at 17-20).

---

[22] The government appears to analyze this issue under the inevitable discovery doctrine, rather than the independent source doctrine.  (Docket ## 74 at 19-23; 92 at 27-30).  In this case, much of the evidence was not seized until a federal search warrant had been obtained and executed, and thus "the proper question appears to be whether the warrant was supported by probable cause without regard to the illegal evidence." *See United States v. Ahmad*, 2012 WL 1944615, *6 n.5 (W.D.N.Y.) (comparing *United States v. Cabassa*, 62 F.3d 470, 473 (2d Cir. 1995); *United States v. Whitehorn*, 829 F.2d 1225, 1231 (2d Cir. 1987), *cert. denied*, 487 U.S. 1237 (1988) and

A.     **Independent Source**

Under the independent source doctrine, evidence originally discovered by illegal means but later seized pursuant to lawful means will not be suppressed.  *Murray v. United States*, 487 U.S. at 542; *see also United States v. Johnson*, 994 F.2d 980, 987 (2d Cir.) ("[c]ourts have applied the independent source exception in cases where the police stumble upon evidence while engaging in an unlawful search or entry, but where there was an independent basis apart from the illegal entry to allow a warrant to issue"), *cert. denied*, 510 U.S. 959 (1993); *United States v. O'Brien*, 498 F. Supp. 2d 520, 540 (N.D.N.Y. 2007) ("[i]f police seize evidence pursuant to a valid search warrant obtained on the basis of information unconnected to an earlier Fourth Amendment violation, there is an independent source for the seizure, and the evidence is untainted and admissible"), *aff'd*, 303 F. App'x 948 (2d Cir. 2008).  The independent source exception requires proof that:  "(1) the warrant . . . [is] supported by probable cause derived from sources independent of the illegal entry; and (2) the decision to seek the warrant [was] not . . . prompted by information gleaned from the illegal conduct."  *United States v. Bonczek*, 391 F. App'x 21, 24 (2d Cir. 2010) (citing *United States v. Johnson*, 994 F.2d at 987).

Rivera's warrant affidavit clearly included observations that Whitt made during the course of his warrantless entry.  (Docket # 36-1 at ¶¶ 29-30).  The affidavit's descriptions of Whitt's observations of the contents of the dumpster and his conversations with the workers at the site plainly resulted from his warrantless entry onto the property.  (*Id.*).  Yet, "'the mere inclusion of tainted evidence in an affidavit does not, by itself, taint the warrant or the evidence seized pursuant to the warrant'[;] . . . [r]ather, a reviewing court 'should excise the tainted evidence and determine whether the remaining, untainted evidence would provide a neutral

---

*United States v. Arms*, 2002 WL 32781, *5 (E.D.N.Y. 2002)), *report and recommendation adopted*, 2012 WL 3028302 (W.D.N.Y. 2012).  In any event, I address the government's inevitable discovery argument below.

magistrate with probable cause to issue a warrant.'"  *United States v. Ahmad*, 2012 WL 1944615 at *6 (quoting *United States v. Trzaska*, 111 F.3d 1019, 1026 (2d Cir. 1997)).  Accordingly, the Court must determine what assertions in the affidavit are tainted by Whitt's entry and whether, after excising all of the tainted assertions, the remaining assertions are sufficient to establish probable cause to support the issuance of the warrant.

Kolokouris maintains that all of the information gathered by law enforcement subsequent to Whitt's entry is tainted.  (Docket # 93 at 40-48).  According to Kolokouris, after excising the tainted information, the affidavit lacks sufficient information to establish probable cause.  (*Id.*).  The relevant assertions in the affidavit comprise four categories of information:

(1)  the anonymous complaint and Whitt's observations prior to entering the premises (Docket # 36-1 at ¶¶ 28-29);

(2)  Whitt's observations and conduct during the warrantless entry (*id.* at ¶¶ 29-30);

(3)  law enforcement's subsequent interview of the workers (*id.* at ¶¶ 33-38); and

(4)  law enforcement's subsequent interview of the company that supplied the dumpster (*id.* at ¶ 39).

The first category of information consists of untainted information.  By contrast, the information contained in the second category, which includes Whitt's observations and information learned during his unlawful entry, is plainly tainted by his warrantless entry and must be excised from the warrant affidavit.  Kolokouris maintains that the information contained in the third and fourth categories is also tainted by the warrantless entry and must be excised. That is a much closer question.

With respect to the third category of information – the interviews with the workers – the government has not clearly established that the workers would have been

identified through sources independent of Whitt's entry.  Rivera explained that the workers were located using the license plate information that Whitt obtained from the truck in which the workers departed.  Kolokouris correctly points out that the photograph depicting the truck's license plate was taken by Whitt inside the premises.  (Docket # 93 at 41 n.8).  The record also contains another photograph of the truck taken by Whitt from outside of the premises.  (Tr. A 13-14, 61; G. Ex. 1).  The photograph depicts an illegible license plate number, and the government has introduced no evidence to suggest that the license plate information was discernable from outside the gate.  Accordingly, I conclude that the government has failed to establish that the workers were or would have been traced through sources independent of the unlawful entry.

Although the exclusionary rule may reach statements from a witness who was identified during the course of an unlawful entry, *see United States v. Hernandez*, 670 F.3d 616, 620 (5th Cir. 2012) ("[v]erbal evidence which derives so immediately from an unlawful entry . . . is no less the 'fruit' of official illegality than the more common tangible fruits of the unwarranted intrusion") (quoting *Wong Sun v. United States*, 371 U.S. at 485), because "the cost of excluding live-witness testimony will often be greater, a closer, more direct link between the illegality and that kind of testimony is required."  *Id.* (quoting *United States v. Ceccolini*, 435 U.S. 268, 277 (1978)); *see also United States v. Leonardi*, 623 F.2d 746, 752 (2d Cir.) ("where the identity and potential usefulness of a witness is revealed as the result of an unlawful search, the willingness of that individual to testify despite the illegal intrusion represents a significant attenuation of the link between the police misconduct and its evidentiary fruits"), *cert. denied*, 447 U.S. 928 (1980).  Accordingly, "[w]here the cooperation of such a 'found' witness is truly the product of that individual's free will, unaffected by the illicit search, the purpose of the exclusionary rule

would not be served by disallowing the testimony." *United States v. Leonardi*, 623 F.2d at 752.

Thus, witness testimony may be admissible "notwithstanding that an unreasonable intrusion was

one step in the series of events which led to the witness testifying" where the court concludes

that the cooperation of the witness was not induced by the government misconduct. *See id.*

      The considerations that inform the determination whether a witness's statements

are sufficiently attenuated from an unconstitutional search include:

    [1]   the degree of free will exercised by the witness;

    [2]   the role of the illegality in obtaining the testimony;

    [3]   the time elapsed between the illegal behavior, the decision to
          cooperate, and the actual testimony at trial; and

    [4]   the purpose and flagrancy of the officials' misconduct.

*United States v. Akridge*, 346 F.3d 618, 626 (6th Cir. 2003), *cert. denied*, 540 U.S. 1203 (2004);

*accord Leonardi*, 623 F.2d at 752. Depending upon the particular facts of the case, the following

additional considerations may also be relevant:

       the stated willingness of the witness to testify; the presence of
       intervening circumstances; the time, place, and manner of the
       initial questioning of the witness; whether the witness himself was
       a defendant; . . . [and] whether investigators knew of the
       relationship, if any, between the witness and the defendant prior to
       the illegal search.

*United States v. Akridge*, 346 F.3d at 626. Generally, courts are more likely to suppress

testimony from third-parties where the witness is "implicated in the criminal activity revealed by

the initial illegality" on the theory that such witnesses are less likely to have "come forward

voluntarily" or to have been "discovered through another source." *Maxy v. Pollard*, 2006 WL

897848, *11 (W.D. Wis.), *report and recommendation adopted*, 2006 WL 5866671 (W.D. Wis.

2006).

In this case, the workers whose statements are at issue were located from observations made during a warrantless entry, the interviews were conducted on the same day as the warrantless entry and at the location where the entry occurred, and presumably involved questions about the suspect asbestos material that Whitt had observed in and near the dumpster upon his warrantless entry – factors that would counsel against an attenuation finding.  *See United States v. Hernandez*, 670 F.3d at 622 (witness testimony not sufficiently attenuated where no "more than a few hours passed between the Fourth Amendment violation and the statements made at the ICE office"); *United States v. Higareda*, 2007 WL 1971942, *6-7 (S.D. Cal. 2007) (witness testimony not sufficiently attenuated where there was nothing to suggest that the witnesses would have been discovered absent the illegal entry, that they independently decided to come forward or that any time had elapsed between the illegal entry and the discovery of the witnesses).  On the other hand, nothing in the record suggests that the workers did not speak voluntarily;[23] indeed, they agreed to return to 920 Exchange Street to be interviewed and arrived at that location in their own vehicle.  Further, Whitt credibly testified that he entered the property out of concern for the workers and in order to assess whether he should issue a stop-work order.  These factors counsel in favor of a finding of attenuation.  *See United States v. Wyler*, 502 F. Supp. 969, 972 (S.D.N.Y. 1980) (witness testimony was attenuated in part where witness traveled to law enforcement office voluntarily to participate in interview in response to request from law enforcement).

---

[23]  Although the workers are not defendants in this action, their involvement in the alleged disturbance of friable asbestos may reasonably have put them in fear of criminal liability and influenced their decision to return to the property and speak to the agents.  *Compare Maxy v. Pollard*, 2006 WL 897848 at *11 (recognizing that third-party testimony is less likely to be suppressed where the witness was the victim or otherwise not implicated in the criminal activity), *with United States v. Higareda*, 2007 WL 1971942 at *6 (testimony suppressed where "the material witnesses are illegal aliens who not only were discovered as a direct result of the illegal search but were implicated thereby in illegal activity) (internal quotations omitted).  No testimony was offered about what discussions, if any, occurred between the agents and the workers on the subject of the workers' possible criminal exposure.

Whether the government has sustained its burden of proving attenuation on the record before the Court is an extremely close question in my estimation.  It does not require resolution, however, because it is ultimately immaterial to the Court's determination of the applicability of the independent source doctrine.  Even if the information provided by the workers is tainted and excised from consideration, (Docket # 36-1 at ¶¶ 33-38), the remaining untainted allegations in the affidavit establish sufficient probable cause for the warrant.[24]

Kolokouris maintains that the remaining category of information – assertions based on an interview of a representative of the company that supplied the dumpster – should be excised from the affidavit because the interviews were the fruit of Whitt's warrantless entry.  I disagree.  The record makes clear that Whitt was able to observe and photograph the dumpster from outside the Violetta Street entrance.  (Tr. A 16; G. Ex. 2).  The photograph that Whitt took using the "zoom" feature on his camera depicts a sign on the dumpster containing a company name (Shanks), location (Lima, New York) and telephone numbers.  (*Id.*).  Although the telephone numbers are slightly blurry, the name and location of the company are distinctly legible in the photograph.  (*Id.*).  On this record, I conclude that the identity of the company was first discovered prior to and independent of Whitt's warrantless entry.

Kolokouris argues that Rivera's affidavit demonstrates that the identity of the company was learned through the interviews with the workers.  (Docket # 93 at 42).  Although he concedes that the photograph contains the name and contact information for the company, Kolokouris argues that the photograph does not constitute an independent source because Whitt failed to mention the dumpster signage when he was asked to describe what the photograph depicted.  (*Id.*).  Additionally, Kolokouris maintains that the government's position is undercut

---

[24]  This decision addresses only whether the information gathered from the workers in their second interviews at the property may be considered in assessing the validity of the warrant, not whether the workers should be permitted to testify at trial.

by the fact that neither Whitt nor Rivera testified that the photograph was reviewed, let alone that it was the source of the information.[25]

Nothing in Rivera's affidavit refutes the reasonable inference that the photograph was the source of the company's identity. Further, the conduct of the investigation reasonably suggests that the photograph was the source of the company's identity: Whitt testified that he identified the realtor of the property from similar signage found at the property. In any event, given the seriousness of the complaint, I find that even if Whitt had not entered the property and spoken to the workers, the investigation would have continued and the dumpster supplier would have been contacted. *See United States v. Barefoot*, 391 F. App'x 997, 999 (3d Cir. 2010) ("[t]he court may presume law enforcement officers will act reasonably, absent evidence to the contrary"); *United States v. Swope*, 542 F.3d 609, 615 (8th Cir. 2008) (district court properly concluded that officers would have continued investigation "regardless of the prior illegal entry and interrogation"), *cert. denied*, 555 U.S. 1145 (2009). For these reasons, I conclude that the information obtained from the interview of the Shanks' representative need not be excised from the affidavit.

I must now assess whether the first and fourth categories of information, taken together, are sufficient to establish probable cause to support the warrant. I conclude that they are.

The Fourth Amendment to the Constitution provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. CONST. amend. IV; *see also* Fed. R. Crim. P. 41. In *Illinois v. Gates*, 462 U.S. 213 (1983), the Supreme Court affirmed the

---

[25] Two additional photographs depict the company name and contact information. (Docket # 93 at 48). Those photographs were taken after Whitt had entered the property and cannot constitute independent sources.

"totality of the circumstances" test to determine whether a search warrant satisfies the Fourth

Amendment's probable cause requirement.  According to the Court, the issuing judicial officer

must "make a practical, common-sense decision whether, given all the circumstances set forth in

the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying

hearsay information, there is a fair probability that contraband or evidence of a crime will be

found in a particular place." *Illinois v. Gates*, 462 U.S. at 238.  A reviewing court's obligation is

merely to determine that the issuing judge had a "'substantial basis for...conclud[ing]' that

probable cause existed." *United States v. Smith*, 9 F.3d 1007, 1012 (2d Cir. 1993) (quoting

*Gates*, 462 U.S. at 238-39) (internal quotation omitted); *Walczyk v. Rio*, 496 F.3d 139, 157 (2d

Cir. 2007) ("a reviewing court must accord considerable deference to the probable cause

determination of the issuing magistrate").  Moreover, "resolution of doubtful or marginal cases

should be largely determined by the preference to be afforded to warrants." *United States v.

Smith*, 9 F.3d at 1012 (citing *Jones v. United States*, 362 U.S. 257, 270 (1960)).

 Rivera's affidavit described the anonymous complaint about improper asbestos

removal at 920 Exchange Street that was provided to the DOL on December 13, 2011.  (Docket

# 36-1 at ¶ 28).  She reported in her affidavit that Whitt had responded to that location to

investigate the complaint and had observed workers moving in and around a dumpster wearing

dust masks or half-face respirators – inadequate equipment for handling asbestos.  (*Id.* at

¶¶ 28-29).  Rivera's affidavit further stated that a Shanks's representative told investigating

agents that Kolokouris and his father had admitted the previous week that there was asbestos in

the dumpster.  (*Id.* at ¶ 39).  Shanks told them that the company was not authorized to handle

asbestos and could not remove the dumpster if it contained asbestos.  (*Id.*).  These allegations,

taken together, provide adequate probable cause to support the warrant.

Concluding that the first requirement of the independent source doctrine is met does not end the inquiry. I must also consider whether law enforcement would have applied for a warrant in the absence of Whitt's unlawful entry. *See United States v. Bonczek*, 391 F. App'x at 24 (second prong of the independent source inquiry is whether the decision to seek the warrant was "prompted by information gleaned from the illegal conduct") (internal quotations omitted). I conclude that the second requirement is also satisfied.

"The primary evil that the motivational inquiry seeks to root out is the so-called 'confirmatory search,'" which occurs "when officers conduct a search to get assurance that evidence is present before taking the time and effort to obtain a warrant." *United States v. Hanhardt*, 155 F. Supp. 2d 840, 847-48 (N.D. Ill. 2001). In this case, Whitt was sent to investigate an anonymous complaint involving inadequately equipped individuals working with potentially dangerous, friable asbestos. In other words, the investigation of the property was prompted by the anonymous complaint, not by Whitt's unlawful entry. *See United States v. Barefoot*, 391 F. App'x at 999 (informant's tip and subsequent investigation of tip, rather than unlawful entry, prompted law enforcement to obtain warrant); *United States v. David*, 943 F. Supp. 1403, 1417 (E.D. Va. 1996) (sequence of events demonstrated that the "investigation of [defendant] after the alleged illegal search was simply a continuation of a previously instituted investigation[;] . . . [t]hus, the investigation of [defendant], which occurred after the alleged illegal search, was completely unrelated to the illegal search and the facts uncovered thereunder"). Upon his arrival, Whitt observed workers without appropriate protective equipment working in and around a dumpster and a debris pile. According to Whitt, those observations, coupled with his knowledge of the nature of the anonymous complaint, raised his concerns for the workers' safety and prompted him to enter the property.

58

After he completed his inspection, Whitt remained at the scene until law enforcement agents arrived.  Although Whitt had entered the property, the law enforcement agents did not and instead remained outside the fence and secured the property while they investigated the complaint.  *See United States v. David*, 943 F. Supp. at 1418 ("[m]ost notably, the agents did not apply for the search warrant immediately after their illegal discovery[;] [r]ather, before pursuing such an application, they undertook an independent investigation").  Their continued investigation included speaking again to the workers and contacting the dumpster supply company.  It was not until the next morning that Rivera applied for the warrant.  On this record, I find that law enforcement would have applied for a search warrant even absent Whitt's warrantless entry.  *United States v. Swope*, 542 F.3d at 616 (district court properly concluded that information known to officers and not the observations made during an illegal entry prompted law enforcement to seek warrant); *United States v. Madrigal*, 103 F. App'x 9, 12 (7th Cir. 2004) (district court properly concluded that observations during illegal search did not prompt officers to seek search warrant because it was reasonable to conclude that the officers would have sought a warrant based upon the independent knowledge known to them); *Johnson*, 994 F.2d at 987 ("[c]learly, the agents would have and could have applied for and been issued a warrant" where there was probable cause to issue a warrant and where "the only reason the agents failed to apply for a warrant prior to [unlawful search] . . . was their mistaken belief that they were entitled to do so"); *United States v. Lyons*, 2015 WL 999922, *8 (D. Minn. 2015) (concluding that officers would have applied for search warrants even if they had not conducted an impermissible canine sniff where the information known to the officers made clear to the court that the "officers would have sought the warrants even if there had been no positive indication for narcotics by [the canine]"); *United States v. Medina*, 2014 WL 4101531, *6

(S.D. Fla. 2014) (concluding that officer would have applied for a warrant even if he had not

unlawfully entered the defendant's room based upon the information known to the officer);

*United States v. Stabile*, 2009 WL 8641714, *4 (D.N.J. 2009) ("[i]t is inconceivable that,

informed [of patently incriminating file names on a computer hard drive], [the agent] would not

have sought a warrant to search the hard drives for child pornography"), *aff'd*, 633 F.3d 219 (3d

Cir.), *cert. denied*, 132 S. Ct. 399 (2011); *United States v. Terry*, 41 F. Supp. 2d 859, 866

(C.D. Ill. 1999) ("[a]lthough [the officers] did not testify as to whether they would have sought

the federal search warrant absent the seizure . . . [,] the evidence shows . . . [t]he police officers

conducting the investigation had ample information to show that an additional search . . . was

warranted"), *aff'd*, 214 F.3d 900 (7th Cir.), *cert. denied*, 531 U.S. 891 (2000); *David*, 943

F. Supp. at 1418 ("the search warrant was not sought in order to sterilize the fruits of the prior

tainted search[;] . . . the court finds that the agents would have continued to investigate

[defendant] and would have applied for the search warrant even had they not [conducted the

unlawful search]").  Accordingly, I find that suppression of the tangible evidence seized from

920 Exchange Street is not required under the independent source doctrine.

### B.  <u>Inevitable Discovery</u>

The government contends that the asbestos-containing material would have

inevitably been discovered regardless of Whitt's warrantless entry.  (Docket ## 74 at 19-23; 92 at

27-30).  According to the government, the record[26] demonstrates that at least eight people,

including the defendant and his father, knew about the presence of asbestos-containing material

at the property.  (Docket # 92 at 29).  The government maintains that any of these individuals –

except for Kolokouris and his father – "would have felt compelled to notify the authorities about

---

[26]  In support of this argument, the government relies upon several investigative reports that were not
introduced into evidence during the evidentiary hearings.  (Docket # 74 at 20-21) (citing exhibits contained in
Docket # 74-1).

the asbestos exposure at 920 Exchange Street." (*Id.* at 30).  Thus, the government reasons, even

if Whitt had not entered the property, someone would have reported the asbestos to authorities.

I have serious doubts whether the government has proffered evidence sufficient to

establish "with a high level of confidence, that each of the contingencies necessary to the legal

discovery of the contested evidence would be resolved in the government's favor." *United*

*States v Stokes*, 733 F.3d 438, 443 (2d Cir. 2013) (citing *United States v. Heath*, 455 F.3d 52, 60

(2d Cir. 2006) ("[u]nder the inevitable discovery exception, unlawfully seized evidence is

admissible if there is *no doubt* that the police would have lawfully discovered the evidence

later")).  The government's evidence demonstrates that the individuals with presumed knowledge

had that knowledge for some period of time without notifying authorities.  (*See, e.g.*, Docket

# 92 at 28 ("the commercial disposal company who owned and placed the dumpster at 920

Exchange Street, knew there was asbestos in the dumpster . . . fully [five] days before [Whitt]

ever visited the Exchange Street parking lot")).  In any event, having concluded that the warrant

is valid under the independent source doctrine, I need not reach the inevitable discovery doctrine.

*See Bonczek*, 391 F. App'x at 24 n.3 ("[w]e do not reach the government's alternative argument

relying on the inevitable discovery doctrine").  Similarly, I need not reach the government's

alternative argument that the agents relied in good faith on the warrant.  (Docket # 65 at 17-20).

### III.     **Validity of the Search Warrant**

Kolokouris also challenges the validity of the warrant under *Franks v. Delaware*,

438 U.S. at 155-56.  (Docket ## 36 at ¶¶ 58-95; 36-2 at 18-21; 52 at ¶ 68; 93 at 40 n.7).

Ordinarily, a reviewing court's obligation is merely to determine that the issuing judge had a

"substantial basis for ... conclud[ing] that probable cause existed."  *Smith*, 9 F.3d at 1012

(quoting *Gates*, 462 U.S. at 238-39) (internal quotation omitted); *Walczyk v. Rio*, 496 F.3d at 157 ("a reviewing court must accord considerable deference to the probable cause determination of the issuing magistrate").  "Nevertheless, little or no deference is due where the government's affidavit misstated or omitted material information about probable cause."  *United States v. Rajaratnam*, 2010 WL 4867402, *7 (S.D.N.Y. 2010) (citing *United States v. Canfield*, 212 F.3d 713, 717 (2d Cir. 2000)), *aff'd*, 719 F.3d 139 (2d Cir. 2013).

Kolokouris requests a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978), claiming that Rivera intentionally misrepresented and omitted evidence when applying for the search warrant for 920 Exchange Street.[27]  Under the Supreme Court's holding in *Franks v. Delaware*, "a district court may not admit evidence seized pursuant to a warrant if the warrant was based on materially false and misleading information."  *United States v. Levasseur*, 816 F.2d 37, 43 (2d Cir. 1987) (citing *Franks*, 438 U.S. at 154).  To justify a *Franks* hearing, a defendant challenging an affidavit must make "a substantial preliminary showing that (1) the affidavit contained false statements made knowingly or intentionally, or with reckless disregard for the truth; and (2) the challenged statements or omissions were necessary to the Magistrate's probable cause finding."  *Id.* (citing *Franks*, 438 U.S. at 171-72) (internal quotation omitted).  A hearing is required if the defendant provides the court with a sufficient basis upon which to doubt the truth of the affidavit at issue.  As the Supreme Court has explained:

> To mandate an evidentiary hearing, the challenger's attack must be
> more than conclusory and must be supported by more than a mere
> desire to cross-examine.  There must be allegations of deliberate
> falsehood or of reckless disregard for the truth, and those

---

[27]  Kolokouris and the government dispute whether Whitt's conduct and knowledge should be imputed to Rivera for the purposes of the *Franks* analysis.  (Docket ## 52 at ¶¶ 55-71; 65 at 16-17).  Even assuming that Whitt's conduct and knowledge are imputed to Rivera, however, probable cause to support the warrant existed independent of Whitt's entry.  *See United States v. Lakoskey*, 462 F.3d 965, 978-79 (8th Cir. 2006) (recognizing that "courts have imputed . . . knowledge to affiants where the information is received from another government official," but holding that even if the information were excluded, "the affidavit still contained sufficient information to support a finding of probable cause"), *cert. denied*, 549 U.S. 1259 (2007).

> allegations must be accompanied by an offer of proof.  They
> should point out specifically the portion of the warrant affidavit
> that is claimed to be false; and they should be accompanied by a
> statement of supporting reasons.  Affidavits or sworn or otherwise
> reliable statements of witnesses should be furnished, or their
> absence satisfactorily explained.

*Franks*, 438 U.S. at 171.

With respect to the first prong, "[a]llegations of negligence or innocent mistake are insufficient."  *Id.*  Instead, "[t]he focus is not on whether a mistake was made, but rather on the intention behind the mistake."  *United States v. Markey*, 131 F. Supp. 2d 316, 324 (D. Conn. 2001) (citing *Beard v. City of Northglenn*, 24 F.3d 110, 116 (10th Cir. 1994)), *aff'd*, 69 F. App'x 492 (2d Cir. 2003).  Thus, *Franks* teaches that not all statements in an affidavit have to be true; instead "the statements [must] be 'believed or appropriately accepted by the affiant as true.'" *See United States v. Campino*, 890 F.2d 588, 592 (2d Cir. 1989) (quoting *Franks*, 438 U.S. at 165), *cert. denied*, 498 U.S. 866 (1990).

With respect to omissions, "the mere intent to exclude information is [likewise] insufficient . . . [because] 'every decision not to include certain information in the affidavit is 'intentional' insofar as it is made knowingly.'"  *United States v. Awadallah*, 349 F.3d 42, 66 (2d Cir. 2003) (quoting *United States v. Colkley*, 899 F.2d 297, 300-01 (4th Cir. 1990)), *cert. denied*, 543 U.S. 1056 (2005).  Accordingly, "[t]o have misled knowingly or recklessly, the government must have done more than make an intentional decision not to include the information, [but] [i]nstead the misleading statement or omission must have been 'designed to mislead' or 'made in reckless disregard of whether [it] would mislead.'"  *United States v. Rajaratnam*, 2010 WL 4867402 at *8 (quoting *United States v. Awadallah*, 349 F.3d at 68).

To determine whether a misstatement in an affidavit is material, the court must "set[ ] aside the falsehoods in the application, . . . and determine [w]hether the untainted portions

[of the application] suffice to support a probable cause . . . finding." *United States v. Rajaratnam*, 719 F.3d 139, 146 (2d Cir. 2013) (internal quotations and citations omitted), *cert. denied*, 134 S. Ct. 2820 (2014).  When the alleged defect involves an omission, however, "'the literal *Franks* approach [does not] seem[] adequate because, by their nature, omissions cannot be deleted'; therefore '[a] better approach ... would be to ... insert the omitted truths revealed at the suppression hearing.'" *Id.* (quoting *United States v. Ippolito*, 774 F.2d 1482, 1487 n.1 (9th Cir. 1985)); *see also United States v. Colkley*, 899 F.2d at 301 ("[f]or an omission to serve as the basis for a hearing under *Franks*, it must be such that its inclusion in the affidavit would defeat probable cause[;] . . . [o]mitted information that is potentially relevant but not dispositive is not enough to warrant a *Franks* hearing").  According to the Second Circuit, "[t]he ultimate inquiry is whether, after putting aside erroneous information and [correcting] material omissions, there remains a residue of independent and lawful information sufficient to support [a finding of] probable cause." *United States v. Rajaratnam*, 719 F.3d at 146 (quoting *United States v. Canfield*, 212 F.3d at 718).

In this case, I find that a *Franks* hearing is not warranted.  Even assuming that Rivera deliberately or recklessly omitted from her affidavit (or misrepresented in her affidavit) the circumstances of Whitt's entry, I conclude that the withheld information was not material to this Court's probable cause finding.  *See Rajaratnam*, 2010 WL 4867402 at *11 ("a *Franks* hearing is required only if the government's misstatements were necessary to [the issuing judge's] decision to authorize the [warrant;] . . . [the inquiry] is, after setting aside the government's misstatements and adding what it omitted from the affidavit, does the [c]ourt find that the affidavit set forth minimally adequate facts to establish probable cause").

The alleged misrepresentations or omissions identified by Kolokouris primarily relate to the circumstances surrounding Whitt's entries into the property and his activities during those entries. (Docket # 36 at ¶¶ 69-89). As discussed at length above, even if all of the information stemming from Whitt's warrantless entries into the property is excised from the affidavit, the remaining allegations establish probable cause to believe that evidence relating to a crime involving asbestos would be found at 920 Exchange Street. Accordingly, I conclude that any alleged misrepresentation or omission was not material to the finding of probable cause for the warrant. *See Rajaratnam*, 719 F.3d at 156-57 & n.20 ("even assuming, *arguendo*, that these alleged misstatements and omissions regarding [the confidential informant] . . . were indeed made with 'reckless disregard for the truth,' we agree with the District Court that they were not 'material'" where the other allegations were sufficient to support finding of probable cause); *United States v. Viers*, 251 F. App'x 381, 383 (9th Cir. 2007) (affirming validity of warrant; "in spite of . . . deliberate or reckless omissions, the informant's tip was not necessary to the finding of probable cause" because probable cause was established on basis of independent investigation), *cert. denied*, 552 U.S. 1275 (2008); *United States v. McGlown*, 200 F. Supp. 2d 1141, 1145-46 (D. Neb. 2002) ("[t]he evidence outlined above demonstrates that even if the confidential source's uncorroborated information is excluded from consideration as unreliable[,] . . . there is simply no indication that the omission of information regarding the confidential source's false statements 'compromised the affidavit to such an extent that it could not have supported a finding of probable cause if [such information] had been included'") (alterations in original) (quoting *United States v. Hall*, 171 F.3d 1133, 1143 (8th Cir. 1999), *cert. denied*, 529 U.S. 1027 (2000)).

Kolokouris also contends that Rivera misrepresented the nature of the complaint by failing to indicate that it had been provided anonymously.  (Docket # 36 at ¶¶ 64-67). Further, according to Kolokouris, Rivera falsely stated that one of the workers reported that he had been instructed to "separate the asbestos out of the dumpster."  (*Id.* at ¶ 90).  The worker's statement was excised, however, from the Court's probable cause analysis set forth above and is thus not material.  I likewise find that the failure to disclose that the complaint came from an anonymous source was not material to the probable cause conclusion.  *See United States v. Castro*, 364 F. App'x 229, 234-35 (6th Cir.) (warrant supported by probable cause despite false representation that complaint came from a confidential informant instead of anonymous source; "having struck the false reference to a confidential informant from the affidavit, the district court properly read the remainder of the affidavit as though the tip came from an anonymous source"), *cert. denied*, 561 U.S. 1018 (2010).  In determining that the affidavit is supported by probable cause, this Court has considered among the totality of the circumstances that the complainant was anonymous.

## IV.    Execution of the Warrant

Kolokouris also seeks suppression of a Home Depot receipt and any other evidence seized from inside desks, filing cabinets or other furniture located in the warehouse at 920 Exchange Street.  (Docket # 36 at ¶¶ 96-99).  Kolokouris argues that because the warrant limited the search to asbestos-containing material, the agents were not authorized to search the inside of furniture.  (*Id.*).

In opposing the motion, the government notes that the warrant authorized the search and seizure of any asbestos-containing material, specifically including "tiles, insulation,

pipes, debris, dry dust, chalky material, and other substances consisting of, or suspected of containing asbestos, or asbestos-containing material." (Docket # 40 at 28). The government represents that the desk and the items "found in and around the desk" were covered in dry dust and the warrant thus authorized the agents to look inside the desk and seize any objects that were dust-covered. (*Id.*). The government has proffered a photograph of the desk that was searched, which appears to show dust on the surface of the desk. (Docket # 40-1 at 16).

A further evidentiary hearing shall be conducted in order to adequately develop the record to permit the Court to determine whether the agents acted within the scope of the warrant when they searched inside the desk and other furniture and seized the Home Depot receipt. Counsel are directed to advise this Court in writing by **August 28, 2015** as to their availability in September for a hearing.


**V.**       **Dismissal of the Indictment**

Kolokouris's omnibus motions papers also seek disclosure of grand jury materials and dismissal of the indictment based upon alleged grand jury irregularities. (Docket # 23-1 at ¶¶ 64-73).

With respect to Kolokouris's request for disclosure of grand jury minutes, his speculative assertion that irregularities may have occurred before the grand jury does not justify disclosure of grand jury minutes. *Douglas Oil Co. of Cal. v. Petrol Stops Nw.*, 441 U.S. 211, 218 (1979); *Pittsburgh Plate Glass Co. v. United States*, 360 U.S. 395, 400 (1959); *United States v. Leung*, 40 F.3d 577, 582 (2d Cir. 1994) ("[a] review of grand jury minutes should not be permitted without concrete allegations of [g]overnment misconduct"); *United States v. Shaw*, 2007 WL 4208365, *6 (S.D.N.Y. 2007).

Similarly, Kolokouris seeks dismissal of the indictment based upon speculation that grand jury irregularities might have occurred.  Speculation is also wholly insufficient to overcome the presumption of regularity that attached to grand jury proceedings.  *United States v. Basciano*, 763 F. Supp. 2d 303, 316 (E.D.N.Y. 2011) ("[defendant's] allegations of 'government misconduct' before the grand jury are insufficient to require dismissal of the . . . indictment or disclosure of the grand jury minutes because they are based entirely on speculation rather than fact"); *United States v. Moody*, 2010 WL 1840214, *1 (D. Conn. 2010) ("[m]ere speculation and surmise as to what occurred before the grand jury are not sufficient to overcome [the] presumption of regularity") (quotations omitted); *United States v. Malizia*, 1999 WL 983879, *4 (S.D.N.Y. 1999) ("[defendant's] conclusory and speculative assertion of grand jury misconduct is patently insufficient grounds for dismissal of the [i]ndictment").

Accordingly, I recommend denial of Kolokouris's motions for disclosure of grand jury minutes and dismissal of the indictment.

## CONCLUSION

For the reasons stated above, I recommend that the district court deny Kolokouris's motions for disclosure of grand jury minutes, dismissal of the indictment, a *Franks* hearing and suppression of statements and tangible evidence seized from 920 Exchange Street, with the exception of the Home Depot receipt and any other evidence seized from inside

furniture located at 920 Exchange Street – as to which a further evidentiary hearing shall be conducted.  (Docket ## 13, 18, 20, 23, 36, 42, 52, 55, 62, 68, 70, 75, 93).


_s/Marian W. Payson_
MARIAN W. PAYSON
United States Magistrate Judge

Dated: Rochester, New York
         August 14, 2015

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

**ORDERED**, that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of this Court within fourteen (14) days after receipt of a copy of this Report and Recommendation in accordance with the above statute and Rule 59(b) of the Local Rules of Criminal Procedure for the Western District of New York.[28]

The district court will ordinarily refuse to consider on *de novo* review arguments, case law and/or evidentiary material which could have been, but was not, presented to the magistrate judge in the first instance. *See*, *e.g.*, *Paterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co.*, 840 F.2d 985 (1st Cir. 1988).

**Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.** *Thomas v. Arn*, 474 U.S. 140 (1985); *Small v. Sec'y of Health & Human Servs.*, 892 F.2d 15 (2d Cir. 1989); *Wesolek v. Canadair Ltd.*, 838 F.2d 55 (2d Cir. 1988).

The parties are reminded that, pursuant to Rule 59(b) of the Local Rules of Criminal Procedure for the Western District of New York, "[w]ritten objections . . . shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority." **Failure to comply with the provisions of Rule 59(b) may result in the District Court's refusal to consider the objection.**

Let the Clerk send a copy of this Order and a copy of the Report and Recommendation to the attorneys for the parties.

**IT IS SO ORDERED.**

                                    *s/Marian W. Payson*
                                    MARIAN W. PAYSON
                                    United States Magistrate Judge

Dated: Rochester, New York
       August 14, 2015

---

[28]   Counsel is advised that a new period of excludable time pursuant to 18 U.S.C. § 3161(h)(1)(D) commences with the filing of this Report and Recommendation.  Such period of excludable delay lasts only until objections to this Report and Recommendation are filed or until the fourteen days allowed for filing objections has elapsed. *United States v. Andress*, 943 F.2d 622 (6th Cir. 1991); *United States v. Long*, 900 F.2d 1270 (8th Cir. 1990).