UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

UNITED STATES OF AMERICA,

Plaintiff,

Case #12-CR-6015-FPG-MWP

v.

DECISION & ORDER

ANASTASIOS P. KOLOKOURIS,

Defendant.

_____

Defendant Anastasios Kolokouris is charged with two counts of violating the Clean Air Act. The first count charges Kolokouris with commencing a project that disturbed asbestos-containing material without first providing written notice to the Environmental Protection Agency ("EPA"). *See* 42 U.S.C. §§ 7412; 7413(c)(1); 18 U.S.C. § 2. The second count charges Kolokouris with causing employees to disturb asbestos-containing material without ensuring that that it was properly wetted, packed, and sealed, and by then failing to properly dispose of the hazardous material. *See id.*

Before the Court are motions filed by Kolokouris seeking disclosure of grand jury materials, dismissal of the indictment, and suppression of evidence. ECF Nos. 13, 18, 20, 23, 36, 42, 52, 55, 62, 68, 70, 75, 93. Kolokouris also seeks a hearing under *Franks v. Delaware*, 438 U.S. 154 (1978), on the grounds that the government made material misrepresentations and omissions in its application for a search warrant. *Id.*

This Court referred all pretrial motions to Magistrate Judge Marian W. Payson pursuant to 28 U.S.C. § 636(b). After conducting multiple hearings, Judge Payson issued a Report and Recommendation on August 14, 2015 (ECF No. 97), recommending that this Court deny all of Kolokouris's motions, including the motions seeking disclosure of grand jury materials,

dismissal of the indictment, and suppression of tangible evidence.  She also recommended denying Kolokouris's motion for a *Franks* hearing.  Kolokouris filed Objections (ECF No. 102) to Judge Payson's Report and Recommendation and, therefore, the matter is now before this Court for review.

Notably, in Judge Payson's Report and Recommendation, she chose to conduct another hearing before determining whether to recommend suppression of certain evidence obtained during the execution of a search warrant in a warehouse.  ECF No. 97, at 66–67.  The government then represented to Judge Payson that it would not seek to introduce that evidence during its case-in-chief.  Accordingly, Judge Payson issued a brief second Report and Recommendation on October 2, 2015, recommending that this Court deny the motions to suppress those pieces of evidence as moot.  ECF No. 105.  Neither side filed objections to the second Report and Recommendation.  The Court will thus also briefly address the matters in the Second Report and Recommendation.

## BACKGROUND

On December 13, 2011 around 11:00 a.m., Inspector Thomas Whitt of the New York State Department of Labor received a phone call from his supervisor.  The supervisor informed Whitt that the Department of Labor had received an anonymous complaint that workers at 920 Exchange Street in Rochester, New York were working with friable asbestos, *i.e.*, asbestos that can be reduced to breathable dust by hand pressure, and that the workers were not wearing protective equipment.  The supervisor asked Whitt to inspect the premises.

Whitt arrived at 920 Exchange Street about an hour later, at 12:00 p.m.  Entry into the premises via Exchange Street was blocked by a locked gate.  Whitt thus drove around to Violetta Street, which is perpendicular to Exchange Street.  Entry via the Violetta Street entrance was

also blocked by a locked gate.  Accordingly, Whitt got out of his car and approached the Violetta Street entrance on foot.

From his vantage point at the Violetta Street gate, Whitt took two photographs that show what he saw.  The first is a relatively distant shot that shows a warehouse and a parking lot with one pickup truck in it.  Gov't Ex. 1.  There is a dumpster in the parking lot.  One person is standing inside the dumpster so that the lower parts of his legs are obscured, and two people are standing on a ledge of the warehouse next to the dumpster.  A pile of debris is next to the dumpster lying in the parking lot.  Whitt's description of the scene accords with the photograph. He testified that he saw "individuals depositing materials into a debris pile next to a dumpster." ECF No. 49, at 13.  He described the debris as "construction debris" and thought that it might contain friable asbestos.  ECF No. 82, at 86–87.

The second photograph is a zoomed-in version of the first.  Gov't Ex. 2.  Notably, it shows a sign posted on the dumpster bearing the name "Shanks" and two phone numbers that appear to be "624-2126" and "582-2120."  The second photograph confirms that there is one individual standing in the dumpster who is, understandably, looking right at the camera.  He is not wearing any protection on his face.  One of the individuals on the ledge next to the dumpster is wearing what looks to be a respirator.  The third individual is wearing some sort of covering over his head.  Whitt's testimony again accords with the second photograph.  He testified that some individuals were wearing half-face respirators, others were wearing dust masks, and none were wearing protective clothing.  ECF No. 82, at 87–90.  He said that a dust mask is "totally unacceptable" in protecting against friable asbestos.  *Id.* at 88.  Whitt also testified that the workers were not employing any "asbestos containment" practices (*id.* at 90), *i.e.*, outfitting the area with tape, film, and filters so that hazardous asbestos did not escape into the environment.

After taking these two photographs through the gate, Whitt waved his hands over his head to get the attention of the workers. When they looked over, Whitt gestured to them to open the gate, and one of the workers made an ambiguous motion with his hands. None of the workers walked over to let Whitt in through the gate.

Thus, Whitt started walking along the gate and, after crossing through two residential properties, he either found an opening in the gate or jumped over a smaller gate to enter the parking lot. Whitt approached the workers, showed them his New York State Department of Labor identification, and told them that they might have been exposed to asbestos. Some of the workers identified themselves and told Whitt they had been hired to perform a task during the day by Defendant. One of the workers gave Whitt the Defendant's phone number, and Whitt told the worker to call the Defendant. In the ensuing phone call with the worker, Defendant apparently told the worker that all of the workers should leave the site.

When the workers went inside the warehouse to get ready to leave, Whitt took some more photographs. He then retraced his route back to his car to retrieve asbestos-sampling equipment and a respirator from his car. While he was retrieving the equipment, the workers opened the Violetta Street gate to leave, so Whitt was able to walk back through the gate with his equipment to inspect the site for the second time. Whitt took samples of the debris pile and some more photographs. The workers had closed the gate when they left, so Whitt again retraced the steps back to his car through the unfenced (or low-fenced) part of the premises.

Whitt then retrieved some warning notices from his car to notify onlookers that work had been suspended due to asbestos. He walked back through the unfenced area and, for the third time, entered the parking lot. He posted the notices on the dumpster and returned to his car via the same unfenced route. He never entered the warehouse on the premises.

4

After his entries into the parking lot, Whitt called Agent Angela Rivera, a law enforcement officer with the Environmental Protection Agency ("EPA").  Whitt told Agent Rivera that he had responded to an anonymous complaint at 920 Exchange Street, and that workers who had now left the premises might have been exposed to asbestos.  Rivera soon arrived at 920 Exchange Street, Whitt relayed his observations and his conversations with the workers to her, but he did not explain how he had entered the property.

Whitt also provided Rivera with the license plate number of the workers' truck that he obtained after he entered the parking lot.  ECF No. 36-1, at 71.  Officers went to the address associated with the license plate and found all of the workers there.  The workers voluntarily agreed to come back to 920 Exchange Street to be interviewed.  In one of these interviews, a worker said that Defendant had hired the group to clean the warehouse and "bag up" insulation in the dumpster.  *Id.* at 72–73.  Another worker said that the Defendant had only provided them with dust masks.  *Id.* at 74.

Rivera submitted an affidavit for a search warrant the next day.  ECF No. 36-1, at 58.  The affidavit generally tracks the facts given above: The New York State Department of Labor received a complaint about improper asbestos removal at 920 Exchange Street.  Whitt saw a dumpster next to a warehouse, and individuals were working around the dumpster with material he believed to be asbestos.  One worker was wearing a respirator and the others were only wearing dust masks.

The affidavit also states that law enforcement contacted Shanks Enterprises, which, again, was the name of the company on the sign affixed to the dumpster.  The affidavit notes that Shanks indicated that they had spoken with Defendant the week before, and Defendant had admitted that there was asbestos in the dumpster.  Shanks had told the Defendant that they would not move the dumpster until all of the asbestos was removed.

The rest of the facts in the affidavit were obtained as a direct result of Whitt entering the parking lot without a warrant.  For instance, the affidavit references Whitt's sampling of the material, his conversations with the workers in the parking lot, and the officers' later interviews of those workers after they traced the pickup truck's license plate to a worker's address.

On the basis of the information in the affidavit, the Magistrate issued a search warrant on December 14, 2011 for the 920 Exchange Street property.  Law enforcement executed the search warrant the same day.  Samples of material taken from 920 Exchange Street on both December 13, 2011 and December 14, 2011 tested positive for asbestos.

Defendant was charged with violations of the Clean Air Act related to improper handling of asbestos, and he has now moved to suppress any evidence seized by Whitt during his three warrantless searches of the parking lot on December 13, 2011.  Defendant has also moved to suppress evidence and fruits seized pursuant to the search warrant on December 14, 2011 on the grounds that without the evidence that Whitt gathered during his three warrantless searches, the warrant never would have been issued.  Additionally, Defendant has moved for disclosure of grand jury materials based on grand jury irregularities, dismissal of the indictment, and a hearing to determine whether the government made misrepresentations in its search warrant application.  Judge Payson recommended that this Court deny all of these motions in her first Report and Recommendation.  ECF No. 97.

Finally, in Judge Payson's second Report and Recommendation, she briefly addressed certain pieces of tangible evidence that law enforcement seized pursuant to the search warrant.  ECF No. 105.  In short, a question arose of whether law enforcement seized evidence outside the scope of the search warrant; the warrant had authorized the inspection of "asbestos-containing material" (ECF No. 36-1, at 7), and law enforcement arguably exceeded that authority by opening the drawers of a desk during the search of the warehouse.  From inside the desk, officers

seized a Home Depot receipt, a dust mask box, and respirator-filter instructions.  Prior to Judge Payson's second Report and Recommendation, the government represented that it would not be introducing these pieces of evidence during its case-in-chief.  Therefore, Judge Payson recommended denying the motion to suppress these materials as moot.

## DISCUSSION

Defendant has made specific objections to parts of the first Report and Recommendation. ECF No. 102.  The Court conducts a *de novo* review of those parts and "may accept, reject, or modify, in whole or in part, the findings or recommendations." *See* 28 U.S.C. § 636(b)(1)(C); *United States v. Gardin,* 451 F. Supp. 2d 504, 506 (W.D.N.Y. 2006).

By contrast, where Defendant has not made specific objections, the Court reviews the Report and Recommendations for clear error.  *See Gardin*, 451 F. Supp. 2d at 506.  Notably, the government did not file any objections, and instead rests on a brief three-page Response to Defense Objections.  ECF No. 103.

The Court will now discuss the matters in both of the Report and Recommendations.

## I. First Report and Recommendation

It is well-established that the Fourth Amendment's prohibition on unreasonable searches and seizures applies to commercial premises.  *See v. City of Seattle*, 387 U.S. 541, 543, 546 (1967).  This prohibition generally means that for the government to enter and search commercial premises, it must either get a search warrant or rely on one of the carefully-delineated exceptions to the warrant requirement.  *See Katz v. United States*, 389 U.S. 347, 357 (1967).  Inspector Whitt conducted multiple warrantless searches of 920 Exchange Street on December 13, 2011.  To avoid suppression of the evidence that he gathered on December 13, 2011, the government has attempted to rely on a variety of exceptions to the warrant

requirement, which are discussed below in Part A below.   In Part B, the Court then discusses suppression of the evidence gathered on December 14, 2011 pursuant to the search warrant.   In Part C, the Court discusses statements Defendant allegedly made to law enforcement.   In Part D, the Court discusses grand jury irregularities and dismissal of the indictment.

### A. Suppression of Evidence Gathered On December 13, 2011 During Whitt's Warrantless Searches

#### 1. *Consent*

The government first argues that the workers consented to Whitt's searches of the premises.   In short, the government asks the Court to construe the nonverbal gesture made by one of the workers to Whitt as Whitt waved to the group from behind the Violetta Street gate as a gesture indicating consent.

Warrantless searches are permissible if based upon voluntary consent.   *Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973).   Judge Payson found that here, based on the worker's ambiguous gesture and the fact that the worker made no attempt let Whitt in through the gate, the workers did not consent to Whitt's entry.   Additionally, she found that even if the workers had so consented, they did not actually have the authority to consent to such a search.   The government did not object to this determination.   This Court agrees that Whitt did not have consent to enter the property.

#### 2. *Exigent Circumstances*

The government next argues that Whitt could enter the property without a warrant in order to protect the workers and the public from imminent harm, namely to protect them from exposure to hazardous asbestos.   In other words, it argues that there were exigent circumstances that allowed Whitt to enter the property without a warrant.

The exigent circumstances doctrine allows law enforcement to enter private property "without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury." *See Michigan v. Fisher*, 558 U.S. 45, 47 (2009) (quoting *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006)). Here, Judge Payson found that there was no exigency to justify the warrantless searches. Whitt received an anonymous complaint about suspected asbestos, and when he arrived at the property, he observed construction debris that he could not be sure contained asbestos. Judge Payson also found that Whitt's conduct on the scene undermined the notion that there was a true exigency: Whitt did not immediately drive over to 920 Exchange Street upon receiving the assignment from his supervisor, he did not immediately warn the workers of their potentially exposure to harmful material when he arrived at the gate, and he himself entered the property without protective clothing. The government did not object to the determination that there were no exigent circumstances to justify the entry, and this Court finds the determination was not clear error.

### 3. *Open Fields*

The government also attempts to rely upon the open fields doctrine. It argues that the warehouse's parking lot should be considered an "open field" over which the Defendant had no reasonable expectation of privacy, and thus Whitt's warrantless searches were lawful.

An open field is traditionally described as the unoccupied or undeveloped area outside a home's "curtilage," with curtilage defined rather obliquely as the "land immediately surrounding and associated with the home." *Oliver v. United States*, 466 U.S. 170, 180 (1984). Accordingly, in this case, if the warehouse functions as the "home," the question is whether Defendant attempted to exclude the public from the parking lot so that it is part of the warehouse's "curtilage," in which he has an expecation of privacy. *See United States v. Hall*, 47 F.3d 1091,

1095 (11th Cir.), *cert. denied*, 516 U.S. 816 (1995); *Air Pollution Variance Bd. of Colo. v. W. Alfalfa Corp.*, 416 U.S. 861, 865 (1974).

Judge Payson found that the Defendant adequately attempted to bar the public from entry onto the parking lot with two locked entrances and fencing that surrounded the premises. Thus, she found that the government could not get around the warrant requirement by calling the parking lot an open field. Furthermore, she noted that even if Whitt entered the premises through a gap in the gates, he only found that gap by trespassing across private property. Accordingly, the fencing still allowed Defendant to retain a reasonable expectation of privacy in the parking lot. The government did not object to this determination, and this Court again agrees with it. The parking lot was part of the warehouse's curtilage and not an open field.

### 4. *Plain View*

The government also argues that the items Whitt seized from the parking lot were in plain view, and thus they are not entitled to Fourth Amendment protection. The government's reasoning appears to be that because Whitt was able to plainly view asbestos and other evidence from the gated entrance at Violetta Street, Defendant "expose[d] it to the public," and thus he had no reasonable expectation of privacy in the evidence seized. ECF No. 74, at 11–12 (quoting *Katz v. United States*, 389 U.S. 347, 351 (1967)).

The government is correct that Defendant had no reasonable expectation of privacy in the actual scene that Whitt was able to view from behind a gate on a publicly-accessible street. The "plain view" doctrine, however, is a seizure doctrine; in other words, when the officer *already has a lawful right of access* to the evidence, he can reach out and seize it as long as it is plainly in view and its incriminating nature is readily apparent. *See Horton v. California*, 496 U.S. 128, 136–37 (1990). Accordingly, in order to rely on plain view, the government must use one of the

exceptions to the warrant requirement to show that Whitt had a lawful right of access to the evidence. Judge Payson correctly determined that the plain view doctrine cannot apply on its own, before the government has established that it had a lawful right of access to the evidence seized.

### 5. *Pervasively Regulated Industries and the Constitutionality of Code Rule 56*

Another way that the government has argued that Whitt lawfully accessed and inspected the parking lot was through his reliance on Code Rule 56. Code Rule 56 a set of asbestos-related regulations promulgated by the New York State Department of Labor. The general purpose of these regulations is to require that persons or companies engaged in asbestos-removal projects follow certain procedures when handling and disposing asbestos-containing material. *See* N.Y.C.R.R. § 56-1.2(b). Code Rule 56 also includes the following critical provision:

> **Right of Entry.** The Commissioner [of the New York State Department of Labor] or officers and employees of the Department [of Labor] shall at any time, from commencement to completion of any asbestos project, have the right to enter any part of such project, or at any time for complaint investigation. Refusal to permit such entry may result in application of appropriate penalties set forth in statute and code including enjoining further work on the project.

N.Y.C.R.R. § 56-12.4 (emphasis in original). In other words, a provision of the Rule allows employees of the Department of Labor to enter property when the Department of Labor receives a complaint about an asbestos project on the property.

Defendant has mounted a spirited attack against the notion that Whitt was able to enter the 920 Exchange Street parking lot under authority of Code Rule 56. Defendant notes that regardless of the language in Code Rule 56, a prerequisite to this type of warrantless search of commercial property is that the owner must be engaged in a "pervasively regulated industr[y]."

11

*New York v. Burger*, 482 U.S. 691, 693 (1987). In short, for an agency to conduct certain searches of businesses without a warrant, the business must be so pervasively regulated by the government that the owner is effectively on notice that his property will be subject to periodic inspections. *See Burger*, 482 U.S. at 701.

The Defendant argues that the Supreme Court has carefully circumscribed only four industries—liquor, firearms, mining, and automobile junkyards—that qualify as pervasively regulated industries where the owner is on such notice. *See City of Los Angeles, Cal. v. Patel*, 135 S.Ct. 2443, 2454 (2015). Asbestos-removal is not one of these industries. More importantly, asbestos-removal is not a distinct "industry" like, for instance, firearms-dealing. Rather, asbestos-removal is an *activity* that cuts across many industries. The alarming implication of mistaking asbestos-removal for an "industry," in the Defendant's words, is as follows: "[E]very owner of an older building . . . would be considered as engaged in a pervasively-regulated business, even when just cleaning or remodeling the premises." ECF No. 102, at 9. Put simply, to mischaracterize asbestos-removal as an "industry" would be to, in actuality, improperly expand the pervasively-regulated exception to a wide variety of diverse industries.

Leaving the propriety of this argument aside for now, the second part of Defendant's attack is that even if he was engaged in a pervasively-regulated industry, Code Rule 56 is unconstitutional on its face. Defendant argues that while warrantless inspections of pervasively regulated industries may be allowed, there still must be an inspection scheme in place for such industries that functions as a "constitutionally adequate substitute for a warrant." *See Burger*, 482 U.S. at 711 (quoting *Donovan v. Dewey*, 452 U.S. 594, 603 (1981)). In other words, while an agency may be able to conduct warrantless inspections of certain pervasively regulated

businesses, a regulatory scheme must still be in place that limits the "time, place, and scope" of inspections. *Id.* (quoting *United States v. Biswell*, 406 U.S. 311, 315 (1972)).

Here, Defendant argues with force that the regulation in question gives a blank check to Department of Labor inspectors as to when and how they conduct inspections. Put simply, the scheme under Code Rule 56 allows for inspectors to enter property "at any time" during an asbestos project whenever the Department of Labor receives a relevant complaint. 12 N.Y.C.R.R. § 56-12.4.

This Court notes that the apparent failure of Code Rule 56 to limit even the time that the Department of Labor can conduct inspections to, for instance, business hours, is worrisome. Inspection schemes that lack timing limits have passed constitutional muster in other courts before, but in those cases, the entire scheme would have been rendered unworkable if timing limits were imposed. *See, e.g.*, *United States v. Soto*, 498 F. Supp. 2d 1041, 1046 (W.D. Mich. 2007) (finding that an inspection scheme for commercial trucking was constitutional even though it did not contain a time restriction because trucks operate twenty-four hours a day). The Court finds it unlikely that an inspection scheme for asbestos projects would be unworkable if the scheme limited inspections to, at least, business hours. In short, the constitutionality of the Right of Entry provision of Code Rule 56 is certainly not clear given the amount of discretion it gives to Department of Labor inspectors.

Defendant concludes his attack by saying that if this is not a pervasively-regulated-industry situation with a scheme in place that limits the time, place, and scope of inspections, there is only one way for this inspection scheme to pass constitutional muster. In short, the scheme must give business owners an opportunity for a neutral decisionmaker to review the decision to inspect before the agency conducts an inspection. *See Patel*, 135 S.Ct. at 2452–54.

This neutral decisionmaker would likely be an administrative law judge. Code Rule 56 does not, of course, provide an opportunity for such review by a neutral decisionmaker.

This Court finds the questions of whether (a) Defendant is engaged in a pervasively-regulated business and (b) whether the Code Rule 56 properly limits the time, place, and scope of inspections to be extremely close. Regardless of the answer to either question, however, if Whitt relied on Code Rule 56 in good faith in conducting the search, suppression would still not be warranted. *See Illinois v. Krull*, 480 U.S. 340, 346, 360–61 (1987). Thus, the Court agrees with Judge Payson that it is prudent to decline to answer these close questions for purposes of a motion to suppress. In the event that this decision is subject to review, Judge Payson has conducted a comprehensive analysis of both issues in her Report and Recommendation.

### 6. *Good Faith Reliance on Code Rule 56*

Simply stated, if an officer conducts a warrantless search under authority of a statute, the evidence he collects will not be excluded even if the statute is later found to be unconstitutional. *See id.* This is known as the good-faith exception to the exclusionary rule. Importantly, the officer must be acting in objectively-reasonable, good-faith reliance on the statute, and the statute must not be so "clearly unconstitutional" that a reasonable officer would simply know he was acting outside of the Constitution. *Id.* at 349–50.

The rationale for the good-faith exception to the exclusionary rule is grounded in the idea that the exclusionary rule is meant to deter unlawful police conduct. *See United States v. Calandra*, 414 U.S. 338, 347 (1974). So, for instance, when law enforcement deliberately sidesteps the Fourth Amendment by fabricating evidence in a search warrant application, the exclusionary rule deters the same conduct in the future by not allowing the government to use the resulting evidence. Accordingly, when a court would not deter wrongful conduct by suppressing

evidence, it must seriously consider whether suppression is warranted in light of the fact that reliable evidence is excluded from the truth-seeking purpose. *See Krull*, 480 U.S. at 347–48.

This principle is illustrated in *Illinois v. Krull*. In that case, an officer conducted a warrantless search of the defendant's business under authority of a state statute that allowed officers to search dealers of car parts without a warrant. *See id.* at 342–43. The statute was later deemed unconstitutional. *Id.* at 345–46. The Supreme Court determined that even though the statute was unconstitutional, a court would not deter any wrongful conduct by suppressing the incriminating evidence. *Id.* at 349–50. In short, the officer had not committed any wrongful conduct that a court could deter; he had simply carried out his official duty in good-faith reliance on a statute. *Id.* Furthermore, the party actually at fault—the state legislature—was charged with enacting broad laws that affect many people in the criminal justice system. *Id.* at 350–51. The legislature's deliberative decision-making process was starkly different than "the hurried judgment of a law enforcement officer engaged in the often competitive enterprise of ferreting out crime," and so its broad decisions would not be affected by the exclusion of evidence in isolated criminal prosecutions. *Id.* (internal quotation omitted).

Here, the facts present an issue of good-faith reliance on a regulation. Judge Payson found that Whitt relied in good faith on Code Rule 56, a regulation promulgated by the New York State Department of Labor, to enter the parking lot. Whitt testified at a hearing that "[a]s an asbestos inspector, [he] operated under Code Rule 56" and that he was "operating under Code Rule 56" during his inspection on December 13, 2011. ECF No. 82, at 12. Judge Payson credited this testimony as evidencing that Whitt relied on his Code Rule 56 authority, specifically the Right of Entry provision recited above, to conduct his inspection. Therefore, she found that the constitutionality of Code Rule 56 was irrelevant in light of Whitt's good-faith reliance on the rule.

Defendant has a host of objections to the notion that suppression is not warranted because Whitt relied on Code Rule 56 to conduct his inspection.

### a. *Actual Reliance*

One of Defendant's objections is that there is insufficient evidence that Whitt *actually* relied on Code Rule 56 in entering the parking lot. Defendant points out that Whitt did not specifically mention the Right of Entry provision in Code Rule 56, Section 56-12.4, in three days of testimony before Judge Payson. Additionally, Defendant points out that in the reports Whitt prepared after his December 13, 2011 inspection, Whitt did not specifically reference Section 56-12.4. ECF No. 36-1, at 53–56.

Furthermore, Defendant argues that Whitt's conduct both before and after the inspection suggests that he did not enter the parking lot under authority of Code Rule 56. Whitt attempted to get the consent of workers prior to entering, and he then wrote in his reports that he entered because the workers invited him onto the property. ECF No. 36-1, at 53, 55. Furthermore, Whitt and other investigators called both the realtor and owner of the property on December 13, 2011 to ask for permission onto the property. In short, the argument is that Whitt never acted like someone who believed he could simply use his Code Rule 56 authority to enter the property.

The Court first notes that the fact that Whitt did not cite the exact provision of Code Rule 56 at issue, Section 12.4, in his reports or testimony does not foreclose the possibility that he was relying on that provision. Whitt is an investigator working in the field, not a lawyer with Code Rule 56 sitting in front of him. This Court does not require him to have an encyclopedic memory of the Code Rule 56 in order to use it and rely on it in performing his day-to-day duties.

Additionally, Whitt did produce a sworn affidavit stating he had specific training on the Right of Entry provision of Code Rule 56, and that it allowed him to enter the parking lot on

16

December 13, 2011.  ECF No. 40-1, at 4.  Furthermore, as Judge Payson pointed out, it was likely natural for Whitt to try to enter the property by consent and then justify his entry by consent.  Whitt, like a lot of people, would prefer to use the path of least resistance in conducting and justifying his duties as opposed to outwardly confronting the workers with his regulatory right to enter.

Additionally, it must be noted that Judge Payson was present at the hearing when Whitt testified that he was operating under Code Rule 56 during the inspection.  In other words, Judge Payson made a credibility determination, with all the same facts in front of her that are currently before this Court, and believed that Whitt actually relied on Code Rule 56 to enter the parking lot.  For this reason and for the reasons cited above, this Court also finds that Whitt actually relied on Code Rule 56 in conducting his inspection.

   b.  *Objectively Reasonable, Good-Faith Reliance*

Defendant also argues that even if Whitt actually relied on Code Rule 56, his reliance was not objectively reasonable and in good faith.  Defendant argues that Whitt's conduct on December 13, 2011 violated guidance he was required to follow by the New York State Department of Labor and Occupational Safety and Health Administration field manuals.  These field manuals instruct inspectors to, for instance, report back to supervisors when there is any question regarding consent to enter property.  They also contain detailed guidance on procedures for seeking subpoenas and warrants.  The argument is that because Whitt followed none of these procedures, he essentially went rogue and was not relying in good faith on any procedures, including the Right of Entry provision in Code Rule 56, to enter the parking lot.

Again, Judge Payson made an important credibility determination on this point.  She found that "Whitt credibly testified that the DOL and OSHA field manuals do not apply to

17

asbestos inspections." ECF No. 97, at 47–48. In other words, she determined that the manuals that Defendant claims Whitt did not abide by were actually not applicable to the December 13, 2011 inspection. The key result is that Judge Payson disagreed with Defendant's argument that Whitt was not relying in good faith on a multitude of required procedures when he entered the parking lot.

Defendant counters in his objections that Code Rule 56 and the manual Whitt did claim he relied on in conducting asbestos inspections, the Asbestos Control Bureau Field Operations Manual, actually incorporate by reference the OSHA requirements for asbestos inspections. To the extent this is true, it is still unclear to the Court how Whitt's failure to precisely follow every OSHA requirement for inspections necessary negates his good-faith reliance on the Right of Entry provision in Code Rule 56. As Judge Payson reasoned, Whitt's "alleged failure to adhere precisely to every procedure in the manual does not invalidate his good-faith reliance on Code Rule 56." ECF No. 97, at 48. In short, this Court does not believe that Whitt's failure to follow every single rule in any of the possible manuals means that he did not follow the Right of Entry provision in conducting his inspection.

To the extent Defendant is arguing that Whitt's reliance on Code Rule 56 was not objectively reasonable, the Court again notes that the two constitutional questions discussed above regarding Code Rule 56—whether Defendant was part of a pervasively regulated industry and whether Code Rule 56 properly limits the time, place, and scope of inspections—are extremely close. In more practical terms, the Court believes it would be reasonable for an average inspector to assume that warrantless administrative searches of asbestos projects are necessary to quickly and adequately prevent the harm associated with asbestos disturbance. *See Krull*, 480 U.S. at 358. Furthermore, the constitutionality of Code Rule 56 has apparently not been challenged in previous cases. Therefore, this Court also agrees with Judge Payson that a

reasonable inspector would not have known that the Right of Entry provision was clearly unconstitutional. *Id.* at 349–50. In short, Whitt's reliance on the provision was objectively reasonable.

### c. Reliance on Code Rule 56 as a Regulation

As a final argument for why this Court should suppress evidence even though Code Rule 56 provides for a right of entry, Defendant argues that Code Rule 56 is a *regulation*, not a *statute*. In short, the Supreme Court case that this Court uses above to discuss Whitt's reliance on Code Rule 56, *Illinois v. Krull*, holds that suppression of evidence is not warranted when an officer relies in good faith on a *statute*. *Id.* at 346, 360–61. Defendant argues that there is a material difference between a regulation and a statute, and this difference should affect whether evidence is suppressed under the good-faith exception.

This argument certainly has some color. In *Krull*, the Supreme Court noted that suppression is not warranted when an officer relies on a defective warrant or defective statute because magistrates and legislators are not "adjuncts to the law enforcement team." *Id.* at 350–51. Stated differently, magistrates and legislators are not tasked with "ferreting out crime." *Id.* at 351. Therefore, there is no use in penalizing them with suppression of evidence when they make a mistake because, in short, they have no stake in the outcome of individual criminal prosecutions.

Agencies like the New York State Department of Labor, on the other hand, *are* tasked in part with ferreting out crime. Indeed, this entire case arose because Inspector Whitt, an employee of the Department of Labor, presented incriminating evidence to the U.S. Attorney's Office, which then charged Defendant with a crime. Defendant has argued that, accordingly, the

Department of Labor *is* an adjunct to the law enforcement team, it *does* have a stake in individual criminal prosecutions, and thus it *will* be deterred by suppression of evidence in this case.

The problem with this argument is that it overly simplifies the role of agencies in our system of government. It is true that part of an agency's function is to ferret out violations of the law by conducting, for instance, inspections of asbestos projects. But another part of an agency's function is to enact rules in a deliberative, drawn-out process that is similar to the statute-making process of a legislative body. When the Department of Labor promulgated Code Rule 56, it was acting much more like a legislature than it was acting like a crime-fighting law enforcement officer.

Thus, the similarity between this case, where a regulation is at issue, and *Krull*, where a statute was at issue, is much closer than Defendant suggests in his objections. The exclusionary rule is, again, aimed at deterring wrongful conduct. Here, just like a legislature, the New York State Department of Labor enacts "broad, programmatic" rules for the purpose of regulating a large amount of people. *Id.* at 352. When it enacts rules like Code Rule 56 under the traditional notice-and-comment procedure, its deliberations are "significantly different from the hurried judgment of a law enforcement officer." *Id.* at 351. Thus, just like a legislature, it is hard to believe that the Department of Labor, as a rulemaking body, would be significantly deterred by suppression of evidence in individual criminal prosecutions.

Furthermore, the Court notes that there is no evidence suggesting that the New York State Department of Labor has enacted a significant number of regulations permitting warrantless searches violative of the Fourth Amendment. Thus, there is no basis to believe that the Department of Labor needs to be deterred from promulgating regulations like Code Rule 56, even assuming Code Rule 56 is unconstitutional. Of course, the Court is also wary here of the substantial social cost of excluding key evidence in a criminal prosecution. In short, without a

20

history of the Department of Labor frequently promulgating rules that violate the Fourth Amendment, it is difficult to justify absorbing that substantial social cost in this case.

Finally, the Court notes that the primary purpose of the exclusionary rule is "to deter *police* misconduct." *Id.* at 348 (citation omitted) (emphasis added). In other words, the primary purpose of suppression in this case would be to deter the wrongful conduct of Inspector Whitt. The Court has already determined that Whitt acted in an objectively-reasonable reliance on Code Rule 56; in other words, there is no wrongful conduct by Whitt to deter in this case. In sum, the primary objective of the exclusionary rule would not be served here.

The Court finds that due to Whitt's objectively-reasonable, good-faith reliance on Code Rule 56, suppression of the evidence Whitt gathered during his December 13, 2011 inspections of the parking lot is not warranted.

### B. Suppression of Evidence Gathered on December 14, 2011 Pursuant to the Search Warrant

Judge Payson also analyzed whether to suppress the tangible evidence seized during execution of the search warrant on December 14, 2011. This evidence was largely asbestos-containing material in and around the dumpster at 920 Exchange Street.

Defendant's argument in his motion to suppress this evidence is, in short, that the search warrant application was filled with information gathered during Whitt's unlawful searches on December 13, 2011. It is helpful here to organize the information in the warrant application into four categories: (1) The anonymous tip and Whitt's observations prior to entering the premises; (2) Whitt's observations and conversations with workers during the warrantless entry; (3) law enforcement's subsequent interviews of the workers; and (4) law enforcement's interview with Shanks, the company that supplied the dumpster. Defendant's argument, and his current objection, is that the only information that is untainted by Whitt's warrantless entry is in category

one, *i.e.*, the anonymous tip and Whitt's observations from behind the gate prior to entering the premises. That tip and Whitt's pre-inspection observations do not add up to probable cause, and thus the warrant was invalid. Furthermore, Defendant argues that the good-faith exception to the exclusionary rule—where a court will not suppress evidence seized in good-faith reliance on an invalid warrant—is not applicable here because the officers who applied for the warrant never told the magistrate that they obtained almost all of their information from a prior warrantless search. *See United States v. Leon*, 468 U.S. 897, 923, 926 (1984).

Of course, the Court has already determined above that due to Whitt's good-faith reliance on Code Rule 56, none of the categories of information are tainted by an unlawful search. However, given Defendant's Objections to Judge Payson's report and for the sake of completeness, the Court will now analyze the legality of the search warrant, assuming that Whitt's warrantless searches on December 13, 2011 were unlawful. Judge Payson found that, even without the information from Whitt's warrantless searches, the warrant was still valid and so the tangible evidence seized pursuant to it should still not be suppressed.

### 1.   *Validity of the Warrant*

The basis for Judge Payson's finding was, in short, that the search warrant was still supported by probable cause even without the tainted fruits from Whitt's searches. The Second Circuit has been clear on how to handle warrant applications containing tainted evidence: A reviewing court should "excise the tainted evidence and determine whether the remaining, untainted evidence would provide a neutral magistrate with probable cause to issue a warrant." *United States v. Reilly,* 76 F.3d 1271, 1282 n.2 (2d Cir. 1996) (quotation and citation omitted). Judge Payson found that even after excising the "tainted" evidence from the application, probable cause still existed for the warrant.

A review of this finding requires a look back at the four categories of information in the search warrant application. It is clear that the information in category one, *i.e.*, the anonymous tip and Whitt's observations prior to entering the premises, is not tainted by Whitt's warrantless searches. It is also clear that the information in category two, *i.e.*, Whitt's observations and conversations with workers during the warrantless entry, is tainted by the warrantless entry and thus should be excised from the warrant application. The key question is, thus, whether the information in categories three and four were tainted by Whitt's warrantless searches and, ultimately, whether the untainted information then adds up to probable cause.

Thus, the Court now turns to the third category of information, which includes the interviews of the workers after law enforcement asked them to come back to the premises. These interviews were a key part of the warrant application as they produced a chronology detailing how and why the Defendant hired the workers on December 13, 2011 and, further, that the Defendant failed to provide the workers with adequate protection from asbestos. ECF No. 36-1, at 72–75.

The interviews of the workers were obtained as a result of Whitt's observation of the license plate number of the pickup truck that was inside the parking lot. Whitt appears to have observed the license plate number *during* his warrantless inspection of the parking lot; indeed, one of the government's exhibits is Whitt's close-up photograph of the back of the pickup truck that Whitt almost certainly took from inside the parking lot. Gov't Ex. 500, at 6. Officers then traced that license plate number to a house where the workers were staying, and they asked the workers to come back to 920 Exchange Street for interviews. The workers voluntarily agreed to return to the premises for the interviews.

Accordingly, Judge Payson went through a detailed analysis of whether the worker interviews were sufficiently attenuated from Whitt's warrantless entry so that they might be

admissible regardless of the warrantless entry. *See Wong Sun v. United States*, 371 U.S. 471, 487–88 (1963). In other words, she analyzed whether the worker interviews were far enough removed from the taint of Whitt's warrantless inspections that, in essence, the taint was purged and the worker interviews should not be excised. *Id.* The factors in conducting an attenuation analysis include, for instance, whether the workers voluntarily agreed to the interview, the amount of time that elapsed between the illegal behavior and the witnesses' decision to cooperate, and the flagrancy of the officials' misconduct. *See United States v. Akridge*, 346 F.3d 618, 626 (6th Cir. 2003), *cert. denied*, 540 U.S. 1203 (2004).

Here, Judge Payson found the attenuation question to be a close call. For instance, while the workers did return to the premises and speak to law enforcement voluntarily, almost no time elapsed between the warrantless searches and the worker interviews. She ultimately determined, however, that it was immaterial to the probable cause analysis whether the worker interviews were excised from the search warrant application. Accordingly, she declined to resolve the issue and turned to the fourth category of information.

There appears to be some confusion on this point based on Defendant's Objections. Defendant objects to Judge Payson's supposed finding that the workers had "voluntarily spoken to the agents" and, thus, he further objects to her "conclu[sion] that the workers' statements were not fruit of the poisonous tree, because they supposedly were attenuated." ECF No. 102, at 18–19. However, Judge Payson did not actually find that the workers statements were attenuated. Rather, she declined to reach the issue because she believed that probable cause existed even if the interviews were excised from the warrant application. Accordingly, in reviewing her analysis, this Court will accept Defendant's argument that the information derived from the interviews should be excised from the warrant application.

That leaves the fourth category of information, which is the information given to law enforcement by the dumpster company, Shanks Enterprises. Again, the question is whether this information should be included in the search warrant application and, if it is included, whether probable cause then supports the warrant. The information in the application resulting from the Shanks call is undoubtedly important for purposes of probable cause: Law enforcement called Shanks, and Shanks said that Defendant had admitted to them a week before that there was asbestos in the dumpster. ECF No. 36-1, at 75. Shanks said they had told Defendant at that time that they would not move the dumpster until he removed the asbestos from it. *Id.*

The critical issue is thus again whether the discovery of the name and phone number of Shanks Enterprises was tainted by Whitt's warrantless entry. Defendant argues strenuously that law enforcement only discovered Shanks's identity from Whitt's warrantless searches into the parking lot. There is some support for this as Whitt took a variety of photographs of the dumpster from inside the parking lot, and a few of them clearly show the Shanks sign on the dumpster. Gov't Ex. 500, at 3, 4, 10, 11, 13.

However, the photographs Whitt took from inside the parking lot are not the only source of Shanks's identity and phone numbers. When Whitt first approached the premises, he took two photographs of the scene from behind the Violetta Street gate. The first is a relatively distant shot that shows three workers in and around the dumpster. Gov't Ex. 1. The second is a zoomed-in version of the first and, importantly, it shows the sign posted on the dumpster bearing the "Shanks" name and two phone numbers that appear to be "624-2126" and "582-2120." Gov't Ex. 2. The government argues that this photograph is the actual source of Shanks's identity, and it was taken before Whitt entered the parking lot. Thus, the Shanks information is untainted and should not be excised from the warrant.

Judge Payson agreed with the government on this point. She found that "[t]he record makes clear that Whitt was able to observe and photograph the dumpster from outside the Violetta Street entrance." ECF No. 97, at 55. She also found that "[n]othing in the [warrant] affidavit refutes the reasonable inference that the photograph was the source of the company's identity." *Id.* at 56.

Defendant has raised a host of objections to this finding. The first objection is that when Judge Payson observed that "[n]othing in the [warrant] affidavit refutes the reasonable inference that the photograph was the source of the company's identity," she inverted the proper burden of proof. In short, it is the government's burden to prove that the information would have been discovered by lawful means. *See United States v. Hernandez*, 670 F.3d 616, 623 (5th Cir. 2012). According to Defendant, the government has not met this burden as it has not produced any evidence that Whitt noted Shanks's identity from outside the gate.

Regardless of who has the burden of proof, however, the Court must be able to draw reasonable inferences from the facts. Here, Whitt took a photograph from behind the gate that clearly depicts the Shanks name and, relatively clearly, also depicts its two phone numbers. Law enforcement then contacted Shanks the next day. ECF No. 36-1, at 75. It is reasonable to infer that before law enforcement contacted Shanks, they looked at Whitt's photograph for Shanks's phone number. Even more persuasively, as Judge Payson pointed out, it is also reasonable to infer that even if Whitt had not entered the property, the investigation would have continued and law enforcement would have contacted Shanks with the use of Whitt's pre-entry photograph. *See, e.g.*, *United States v. Swope*, 542 F.3d 609, 615 (8th Cir. 2008) (affirming a district court that found that officers would have continued investigation "regardless of the prior illegal entry and interrogation").

Defendant's second argument is based on the order of information discussed in the warrant affidavit.   In short, the warrant affidavit proceeds in chronological order in terms of when law enforcement gathered each piece of evidence.   First, the affidavit discusses the anonymous tip.   Next, it discusses Whitt's arrival at the premises, his observations from outside the gate, and the workers' statements to Whitt when he was inside the parking lot.   Finally, near the end, it mentions the information derived from the phone call with Shanks.   Defendant argues that because the affidavit proceeds in chronological order and the discussion about Shanks appears at the end of the affidavit, Whitt's observation of the Shanks sign must have been near the end of his inspection.

I disagree.   The affidavit's discussion about the information provided Shanks—namely, that Shanks had spoken to Defendant about the asbestos-filled dumpster the week before—occurs at the end of the affidavit because law enforcement spoke to Shanks at the end of their investigation.   As the affidavit states, "[o]n December 14, law enforcement contacted Shanks Enterprises."   ECF No. 36-1, at 75.   Shanks indicated that they had spoken with Defendant the week before where he had "admitted to knowing that there was asbestos in the dumpster."   *Id.* The present question for the Court, however, is not *when the fruit from Shanks was gathered*; it is *when the identity of Shanks was discovered.*   Per the photograph taken on December 13, 2011 and the Court's reasonable inference, the source of the Shanks information was Whitt's observation of the Shanks sign before he entered the parking lot.

Defendant's remaining argument regarding the Shanks information being tainted is that the pre-entry photograph showing the Shanks sign was not attached to the warrant affidavit.   Rather, two other photographs were attached to the affidavit; one is an aerial shot of the premises and the other was apparently taken by Rivera, the EPA agent who arrived on scene.   The argument is that because neither of the photographs attached to the affidavit depict the Shanks

sign (ECF No. 36-1, at 78–79), law enforcement did not rely on Whitt's pre-entry photograph of the Shanks sign in preparing the warrant affidavit.

The Court responds here that officers presumably attached the photographs to the affidavit that they thought would bolster their case for probable cause. Whitt's photograph showing the Shanks sign would not have added anything to the probable cause determination; the photograph and its fruits, *i.e.* the information provided by Shanks, were already fully described in the affidavit itself. In short, the Court does not accept Defendant's argument that the officers' failure to attach the pre-entry photograph to the warrant affidavit means that they did not use that photograph to call Shanks on December 14, 2011.

In sum, this Court agrees with Judge Payson that the fourth category of information, law enforcement's phone call with Shanks Enterprises, was untainted by Whitt's warrantless inspection.

The next part of the analysis is whether the first and fourth categories of information are sufficient to establish probable cause. In this regard, with the tainted evidence excised, the warrant application states that the New York State Department of Labor received an anonymous tip about improper asbestos removal at 920 Exchange Street. Whitt arrived on the scene and, from his vantage point outside the Violetta Street gate, he observed individuals working in and around a dumpster and debris that he thought contained asbestos. One worker was wearing a half-face respirator and two others were wearing dust masks.

The affidavit also states that law enforcement called Shanks Enterprises, the company that provided the dumpster. Shanks indicated that they had spoken with the Defendant the week before, and he had admitted that there was asbestos in the dumpster. Shanks told Defendant during their conversation that Defendant needed to remove the asbestos before Shanks would move the dumpster.

The Court agrees that this information, which does not include any evidence gathered from Whitt's warrantless inspections, adds up to probable cause.

Finally, the Court will briefly consider whether law enforcement would have applied for the warrant even without Whitt's warrantless entry. This is the final inquiry in cases where some of the information in a warrant application was discovered by unlawful means. *See United States v. Bonczek*, 391 F. App'x 21, 24 (2d Cir. 2010) (observing that after a court determines that probable cause exists independent of the unlawful entry, it must determine whether the warrant was "prompted by information gleaned from the illegal conduct") (quotation and citation omitted).

The Court believes that even without the information gleaned from Whitt's warrantless inspections, law enforcement still would have applied for the search warrant. Notably, the entire sequence of events leading to this investigation was prompted by an anonymous tip, not by Whitt's unlawful entry. So in a straightforward sense, the investigation and application was not prompted by the warrantless entry. Additionally, when Whitt later called law enforcement to the premises after his warrantless entry, officers did not immediately rush to the magistrate to get a warrant. Rather, they spoke to both Whitt and the workers later in the day, called Shanks the next day, and then applied for the warrant. The Court finds that given these facts, and given the severity of Defendant's conduct in exposing workers and the public to harmful asbestos, officers would have sought a warrant regardless of Whitt's warrantless entry.

2. *Inevitable Discovery*

The government has also argued that even without the warrantless inspections by Whitt, law enforcement would have inevitably discovered the friable asbestos in the dumpster. The essence of the argument is that multiple people knew about the asbestos-filled dumpster, mostly

including the owner of Shanks and people who came into contact with the Shanks owner. According to the government, one or more of these people inevitably would have notified law enforcement about the asbestos, and thus the exclusionary rule should not apply to the asbestos found at 920 Exhange Street. *See United States v. Heath*, 455 F.3d 52, 60 (2d Cir. 2006).

Like Judge Payson, this Court has serious doubts about whether law enforcement would have inevitably discovered the asbestos. The "inevitable" part of the inevitable discovery exception to the exclusionary rule establishes a high bar for the government to use the exception. *See Heath*, 455 F.3d at 60 ("Under the inevitable discovery exception, unlawfully seized evidence is admissible if there is *no doubt* that the police would have lawfully discovered the evidence later.") (emphasis in original) (quotation and citation omitted). In any event, due to the Court's finding that probable cause existed for the warrant even after excising tainted pieces of the warrant application, the Court does not reach a decision on whether the government can rely on the inevitable discovery exception.

### 3. *Good-Faith Reliance on an Invalid Warrant*

Under the good-faith exception to the exclusionary rule, evidence seized pursuant to a warrant that turns out to be invalid will not be suppressed if officers relied on the warrant in good faith. *See United States v. Leon*, 468 U.S. 897, 923, 926 (1984). Defendant has argued that because the government failed to advise the magistrate of Whitt's warrantless inspections, the good-faith exception should not apply and the evidence seized pursuant to the warrant should be suppressed. *Id.* at 923.

Again, the Court has already determined above that even without the information from Whitt's warrantless inspections, the warrant was supported by probable cause. Thus, the Court

does not need to reach the issue of whether the good-faith exception for invalid warrants applies here.

### 4. *Hearing under* Franks v. Delaware

Defendant has also moved for a hearing under *Franks v. Delaware*, 438 U.S. 154 (1978). *Franks* hearings are used by courts to determine whether officers made untruthful statements or omissions in their application for a search warrant. *Id.* at 155–56. Defendant ultimately seeks to convince the Court to excise these untruthful statements from the application, declare the warrant invalid, and thus suppress evidence seized pursuant to the warrant.

In short, Defendant argues that Rivera, the EPA agent who applied for the warrant, failed to disclose to the Magistrate that almost all of the information in the warrant application came from Whitt's warrantless searches. Additionally, Defendant argues that Rivera described the anonymous tip as a "complaint," thereby suggesting a much more credible referral than an anonymous tip. ECF No. 36-1, at 70.

To successfully move for a *Franks* hearing, a defendant must make a showing that "a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and . . . the allegedly false statement [was] necessary to the finding of probable cause." *Id.* The Court has already determined above that Whitt's warrantless entry, which is the principal omission in the warrant application, produced fruits that were not necessary to the probable cause finding. Accordingly, Defendant has not made the required preliminary showing for a *Franks* hearing.

The Court also will briefly address the agent's "misleading" characterization of the anonymous tip as a "complaint" in the warrant application. It is true that lawyers refer to unsourced calls like the one that triggered this entire investigation as "anonymous tips." *See*

*Illinois v. Gates*, 462 U.S. 213, 237 (1983). However, those who are unaware of the entire body of case law surrounding anonymous tips may reasonably refer to such calls as "complaints." Indeed, the very Right of Entry provision in Code Rule 56 that underlies the first part of this Decision and Order allows for warrantless entry into an asbestos project "at any time for complaint investigation." N.Y.C.R.R. § 56-12.4. Therefore, it is understandable that agents working with Code Rule 56 would refer to an anonymous "tip" as a "complaint."

In short, the Court does not view the agent's characterization of the anonymous tip as a "complaint" in the warrant application to be intentionally or recklessly misleading. The agent never suggested to the Magistrate that she knew the tipster or knew that the tipster had firsthand knowledge of the dangerous conditions around the dumpster. Therefore, the agent was not intentionally or recklessly misleading in referring to the anonymous tip as a complaint.

### C. Suppression of Statements Made by Defendant

Defendant's prior counsel moved to suppress statements Defendant allegedly made to law enforcement. ECF No. 23-1, at 37–38. The motion included boilerplate language, and Judge Payson asked prior counsel to provide an affidavit from Defendant as to the statements. Neither Defendant's prior counsel nor his current counsel ever provided such an affidavit or identified any statements made by Defendant to law enforcement. Accordingly, the motion to suppress Defendant's statements to law enforcement is denied.

### D. Dismissal of the Indictment

Defendant's prior counsel also sought disclosure of grand jury materials and dismissal of the indictment. Once again, the motion included boilerplate language including, for instance, allegations that some of the grand jurors may not have been present during the entire presentation of evidence. ECF No. 23-1, at 33–37.

As Judge Payson has pointed out, speculative assertions that grand jury irregularities may have occurred does not justify disclosure of grand jury minutes. *See United States v. Leung*, 40 F.3d 577, 582 (2d Cir. 1994). Similarly, speculation and boilerplate allegations of misconduct are not sufficient to overcome the presumption of regularity in grand jury proceedings. *See United States v. Basciano*, 763 F. Supp. 2d 303, 316 (E.D.N.Y. 2011). Accordingly, Defendant's motions for disclosure of grand jury materials and dismissal of the indictment are denied.

## II. <u>Second Report and Recommendation</u>

In Judge Payson's first Report and Recommendation (ECF No. 97), she reserved judgment on whether law enforcement exceeded the scope of its search warrant on December 14, 2011. In short, Defendant argued that the warrant limited the search to asbestos-containing material, and law enforcement opened up the drawers of a desk inside the 920 Exchange Street warehouse. In the drawers, officers found a Home Depot receipt, a dust mask box, and respirator filter instructions. Instead of assessing whether to suppress this evidence in her first Report and Recommendation, Judge Payson decided to have a separate hearing on whether law enforcement collected the evidence outside the scope of the warrant.

Subsequent to her issuance of the first Report and Recommendation, the government indicated that it would not seek to introduce in its case-in-chief the Home Depot receipt, the dust mask box, the respirator filter instructions, or any photographs of or fruits derived from such items. The parties have agreed that the motion seeking to suppress these items is now moot and, accordingly, Judge Payson recommended denying this motion to suppress in her second Report and Recommendation. ECF No. 105, at 2. The Court denies the motion to suppress the items seized from inside the desk as moot.

## CONCLUSION

For the foregoing reasons, both the Report and Recommendation issued on August 14, 2015 (ECF No. 97) and the Report and Recommendation issued on October 2, 2015 (ECF No. 105) are ADOPTED IN THEIR ENTIRETY.  In sum, the Court DENIES Defendant's motions seeking suppression of evidence, a *Franks* hearing, disclosure of grand jury materials, and dismissal of the indictment.  ECF No. 13, 18, 20, 23, 36, 42, 52, 55, 62, 68, 70, 75, 93.


IT IS SO ORDERED.

DATED:        November 13, 2015
              Rochester, New York


HON. FRANK P. GERACI, JR.
Chief Judge
United States District Court